**In re AUTO INTERNATIONAL REFRIGERATION,**
Debtor.

**Jeffrey H. Mims, Chapter 7 Trustee, Plaintiff,**

v.

**Fidelity Funding, Inc. and Guaranty Business Credit Corporation, Defendants.**

**Bankruptcy No. 99–33892–HCA–7.**
**Adversary No. 00–3446.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

March 15, 2002.

Kevin M. Lippman, Munsch, Hardt, Kopf, Harr & Dinan, Dallas, TX, for plaintiff.

Bruce W. Bowman, Winstead, Sechrest & Minick, Dallas, TX, for defendants.

### MEMORANDUM OPINION

HAROLD C. ABRAMSON, Bankruptcy Judge.

On May 28, 1999, Auto International Refrigeration, the above captioned debtor ("AIR"), filed a petition for reorganization under Chapter 11 of the Bankruptcy Code (the "Code"). AIR was a business that sold, both retail and wholesale, automotive refrigeration parts. A Motion to Convert the case to Chapter 7 was subsequently granted on November 2, 1999, based on the continued diminution of the AIR estate post-bankruptcy, which left AIR with an inability to reorganize. On September 27, 1999, prior to the Motion to Convert being granted, Guaranty Business Credit Corporation ("GBCC"), d/b/a Fidelity Funding Inc. ("Fidelity"), a creditor of AIR, filed a proof of claim in AIR's bankruptcy in the amount of $224,730.51 (the "Claim"), based upon a Loan and Security Agreement entered into between AIR and Fidelity (the "Loan Agreement").[1] After conversion, Jeffrey H. Mims ("Plaintiff"), was appointed the Chapter 7 Trustee for the AIR estate.

Plaintiff initiated this adversary proceeding against Fidelity on September 11, 2000, asserting claims for usury, breach of contract, and for equitable subordination of Defendants' Claim in AIR's bankruptcy. After Defendants filed their Claim, Plaintiff amended its complaint on December 6, 2000, adding GBCC as a joint and several defendant with Fidelity. After amending its complaint for a second time, Plaintiff then filed a Motion for Summary Judgment on August 24, 2001, which was countered by Defendants' Motion for Summary Judgment filed on the same date. On November 30, 2001, this Court entered an Order granting in part and denying in part both Plaintiff's and Defendants' Cross Motions for Summary Judgment (the "Summary Judgment Order"). Plaintiff then filed a Motion for Reconsideration and Re-

---

1. While the Loan Agreement was originally entered into between AIR and Fidelity, it was transferred to GBCC on June 11, 1999 after Fidelity and Guaranty Federal Bank, the parent of GBCC ("GFB"), entered into an Asset Purchase Agreement on May 7, 1999 for the transfer of several loans, including the afore- mentioned Loan Agreement. GBCC and Fidelity then filed a Claim in AIR's bankruptcy under Guaranty Business Credit Corporation, d/b/a Fidelity Funding Inc. Hereinafter, GBCC and Fidelity will collectively be identified as Defendants.

quest for Hearing (the "Reconsideration Motion"), which this Court granted on January 16, 2002. After consideration of all evidence presented in this adversary proceeding, this Court enters this Memorandum Opinion disposing of all issues.

FACTUAL BACKGROUND

As of the date of the bankruptcy petition, AIR had debt outstanding to Defendants under the terms of the Loan Agreement, which was entered into on June 30, 1998. Under the Loan Agreement, Defendants offered to AIR a revolving credit loan (the "Loan"), secured by, among other things, all of AIR's accounts receivable, allowing AIR to borrow and repay advances of principal up to a Facility Limit of $1,500,000. Pursuant to the Loan Agreement, the amount of principal that could be borrowed by AIR at any one time was limited under a prescribed Borrowing Base formula based on AIR's accounts receivable,[2] with the aggregate amount of outstanding principal limited to the lesser of the Borrowing Base or the Facility Limit. The stated interest rate under the Loan Agreement was prime plus 2½ percent, with the interest rate fluctuating between 11 and 10¼ percent over the eleven months prior to bankruptcy.

In addition, the Loan Agreement also called for various fees and charges to be paid by AIR, including Initial and Annual Facility Fees, a Due Diligence Deposit, Attorney's Fees, a Collateral Monitoring Fee, an Audit Fee, and other Additional Expense Reimbursements. When these fees became payable by AIR, they were recorded on AIR's account, with interest accruing on the fees from the date recorded. The initial advance of principal under the Loan Agreement was made on June 30, 1998 in the amount of $581,661.07, but this amount included the Initial Facility Fee in the amount of $22,500.

Under the terms of the Loan Agreement, the filing of a petition in bankruptcy constituted an Event of Default. While the majority of the Events of Default gave the Defendants the option of accelerating the entire principal amount of the debt by notifying AIR of its intent to do so, if the Event of Default was AIR's filing of bankruptcy, all of the obligations under the Loan Agreement would automatically be immediately due and payable. However, if an Event of Default did occur, and the Loan Agreement was accelerated resulting in usurious interest being charged, the Loan Agreement included a Savings Clause requiring Defendants to reduce the interest to a non-usurious amount.

On July 9, 1999, Defendants, believing that the Loan Agreement had exceeded the legal interest rate of eighteen percent allowed under Texas law,[3] sent a Cure Letter to AIR's counsel, pursuant to Texas Finance Code § 305.103(a),[4] stating that

2. Section 1.1 of the Loan Agreement provides in pertinent part:

"**Borrowing Base**" means an amount equal to the sum, determined by [Defendants] from time to time, of (a) 80% of the face amount of Eligible Accounts, plus (b) the lesser of 50% of the value of Eligible Inventory, valued at the lower of cost or market. [Defendants] may change the percentage of Eligible Accounts or Eligible Inventory constituting the Borrowing Base from time to time based upon dilution and other factors deemed appropriate by [Defendants].

3. Section 303.009(a) of the Texas Finance Code provides in pertinent part that "if the rate computed for the weekly, monthly, quarterly, or annualized ceiling is less than 18 percent a year, the ceiling is 18 percent a year."

4. Section 305.103(a) of the Texas Finance Code provides:
(a) A person is not liable to an obligor for a violation of this subtitle if:
(1) not later than the 60th day after the date the creditor actually discovered the violation, the creditor corrects the violation as to that obligor by taking any necessary

AIR's account had received a credit of $68,825.40.[5] Then on July 12, 1999, Defendants sent a second Cure Letter to AIR's counsel confirming a second credit of $4,070.96.[6] Plaintiff responded to these Cure Letters by sending a letter to Defendants on September 14, 1999, alleging certain matters which it contended made the Loan Agreement usurious.

Plaintiff alleges that the Loan Agreement is not only facially usurious, but when the Loan Agreement was accelerated, which Plaintiff claims occurred not only by the express terms of the Loan Agreement, by operation of bankruptcy law, and by affirmative action of the Defendants, the Loan Agreement became usurious. Plaintiff believes that the maximum amount of interest that could have been charged over the term from closing to bankruptcy was $40,794.41, but when the $33,993.71 in interest actually charged by Defendants is added to the $144,467.44 in fees which it alleges to be interest, the total interest charged over that same time span was $178,460.97. Subtracting the maximum amount of interest that could have been charged from the alleged interest, Plaintiff believes that Defendants charged AIR $137,669.56 in usurious interest.

Because Plaintiff alleges that Defendants charged AIR usurious interest, in Count 1, it asked this Court to assess the triple penalty pursuant to Texas Finance Code § 305.001,[7] equaling $413,008.68. In addition, because Plaintiff alleges that more than twice the legal amount of interest was charged, Plaintiff asks this Court to award it the principal on which the usurious interest was charged, plus the interest and fees charged by Defendants pursuant to Texas Finance Code § 305.002,[8] which amounts to $1,933,716.92. Plaintiff asks that these penalties, totaling $2,346,725.60, be assessed against the Defendants, which if done, would net

---

action and making any necessary adjustment, including the payment of interest on a refund, if any, at the applicable rate provided for in the contract of the parties; and (2) the person gives written notice to the obligor of the violation before the obligor gives written notice of the violation or files an action alleging the violation.

5. The July 9, 1999 letter from Defendants to AIR provides in pertinent part:
 ... pursuant to applicable law, this letter is to notify [AIR] that on July 9, 1999, [Defendants] discovered that [they] had violated the interest rate limitation provisions of Texas law by charging AIR interest in excess of the maximum amount authorized by law in connection with the Loan and Security Agreement dated June 30, 1998 ... [and] pursuant to applicable law, on July 9, 1999, [Defendants] corrected the above violation by crediting the account of AIR the amount of [$68,825.40].

6. The July 12, 1999 letter from Defendants to AIR provides in part that "[o]n July 12, 1999, [Defendants] credited the account of AIR the additional amount of [$4,070.96]. [Defendants

have] now credited the AIR account for all interest charged in excess of the maximum rate allowed by law plus interest on such amount."

7. Section 305.001(a) of the Texas Finance Code provides:
 (a) A person who contracts for, charges, or receives interest that is greater than the amount authorized by this subtitle is liable to the obligor for an amount that is equal to the greater of:
 (1) three times the amount computed by subtracting the amount of interest allowed by law from the total amount of the interest contracted for, charged, or received; or
 (2) $2,000 or 20 percent of the amount of the principal, whichever is less.

8. Section 305.002(a) of the Texas Finance Code provides in pertinent part: "[A] person who contracts for, charges, or receives interest that is greater than twice the amount authorized by this subtitle is liable to the obligor for the principal amount on which the interest is contracted for, charged, or received as well as interest and all other charges."

$2,131,995.09 after elimination of Defendants' Claim of $224,730.51.

In Count 2, Plaintiff alleges that Defendants are in breach of the Loan Agreement because they did not "promptly" refund the usurious interest Plaintiff believes to have been charged, and thus requests an amount at least equal to the usurious interest charged of $137,669.56. Finally, in Count 3, Plaintiff requests that Defendants' allowed claim in the bankruptcy be equitably subordinated, pursuant to 11 U.S.C. § 510(c), to all other allowed claims based upon Defendants charging of usurious interest under the Loan Agreement.

Defendants responded by alleging that not only is the Loan Agreement not facially usurious, but even if the Loan Agreement had been accelerated, which it alleges did not occur, the Loan Agreement would still not be usurious because the Fees which Plaintiff believes are interest, are in fact "bona fide" fees, and as such can not be interest. Defendants also believe that even if the Fees are in fact interest, they are to be spread over the contracted-for term of the Loan Agreement, and not the shorter time from closing to bankruptcy, which would make the Loan Agreement non-usurious. Finally, Defendants raise the defenses of the Cure Letters and the Savings Clause to defeat any potential usury.[9] As to Plaintiff's breach of the Loan Agreement claim, Defendants believe that they are not in breach because no usurious interest was charged, AIR has not performed under the Loan Agreement by paying back principal and interest, and any usurious interest that was charged was "promptly" cured by Defendants' Cure Letters.

Based on the foregoing, the issues which the parties have put before this Court for determination are as follows:

1) whether the fees charged by Defendants are "bona fide" fees or disguised interest;

2) whether the Loan Agreement was accelerated, either by the express terms of the Loan Agreement, by operation of bankruptcy law, or by affirmative action of Defendants, thus making the period for determining usury the time from closing to bankruptcy and not the contracted-for three year term;

3) whether the Loan Agreement was usurious, including the maximum amount of interest that could have been charged under the Loan Agreement pre-bankruptcy and post-bankruptcy;

4) whether the Loan Agreement was facially usurious;

5) whether GBCC assumed Fidelity's liability for usury or had any knowledge of potential usury;

6) whether Defendants' Cure Letters were judicial admissions and whether they were proper in light of Texas law;

7) whether the Loan Agreement's Savings Clause was an effective defense to usury;

8) whether Defendants breached the Loan Agreement by not "promptly" crediting back usurious interest; and

9) whether Defendants' Claim should be disallowed under the Bankruptcy Code.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), made applicable by Federal Rule of

---

**9.** Plaintiff argues that Defendants' defense of the Cure Letters fails not only because the letters lacked required content, but the letters also fail because they did not correct the usury violation that Plaintiff believes occurred. Plaintiff also argues that the Savings Clause fails not only because the Loan Agreement is facially usurious, but for a Savings Clause to be effective, the Clause must be effectuated by the lender and also correct the entire violation that Plaintiff believes occurred.

Bankruptcy Procedure 7056, summary judgment may be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law because no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must draw inferences in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (1995). The respondent may not rest on the mere allegations or denials in its pleadings but must set forth specific facts showing a genuine issue for trial. *Matsushita Electric Industrial Co., Inc. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum,* 66 F.3d at 92. Once a summary judgment motion is made and properly supported, the non-movant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

### Plaintiff's Claim for Usury

#### 1. "Bona Fide" Fees Versus Disguised Interest Under Texas Law

■ To prevail on a claim of usury, the Texas Supreme Court has stated that a plaintiff must show "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower." *First Bank v. Tony's Tortilla Factory, Inc.,* 877 S.W.2d 285, 287 (Tex.1994) (citing *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982)). A determination of whether a transaction is usurious is made "by a construction of all the documents constituting the transaction, interpreted as a whole, and in light of the attending circumstances." *Tygrett v. University Gardens Homeowners' Ass'n,* 687 S.W.2d 481, 485 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The penultimate factor in determining whether a usury violation has occurred is "the exaction of a greater compensation than allowed by law for the use of the money by the borrower." *Tony's Tortilla Factory,* 877 S.W.2d at 287. However, it is rare for a lender to commit usury by blatantly charging an interest rate higher than that allowed by law. The more common commission of usury is where a lender charges the borrower fees which are disguised interest, and when added to the stated interest, those fees push the interest rate above that allowed by law. Therefore, the first issue which this Court must address is whether or not the fees charged by the Defendants are "bona fide" fees or disguised interest.

■ In its most recent usury opinion, the Texas Supreme Court stated that "[a]mounts charged or received in connection with a loan are not interest if they are not for the use, forbearance, or detention of money." *First USA Management Inc. v. Esmond,* 960 S.W.2d 625, 627 (Tex. 1997). In determining whether a fee is for the "use, forbearance, or detention of money," the court has consistently held that "[f]ees which are an additional charge supported by a distinctly separate and additional consideration, other than the simple lending of money, are not interest and thus do not violate the usury laws." *Tony's*

*Tortilla Factory,* 877 S.W.2d at 287; *see also Texas Commerce Bank–Arlington v. Goldring,* 665 S.W.2d 103, 104 (Tex.1984); *Stedman v. Georgetown Savings and Loan Ass'n,* 595 S.W.2d 486, 488 (Tex.1979); *Ross v. Walker,* 554 S.W.2d 189, 190 (Tex. 1977); *Gonzales County Sav. & Loan Ass'n v. Freeman,* 534 S.W.2d 903, 906 (Tex.1976); *Greever v. Persky,* 140 Tex. 64, 165 S.W.2d 709, 712 (1942).[10] In addition, the Texas Supreme Court held in *Nevels v. Harris,* and what Plaintiff advocates as the proper law to apply, that "bona fide fees ... paid to the lender's special agents, are not to be considered as interest under our usury laws where such agents have only limited or special authority, and the lender does not participate in the funds so paid." 129 Tex. 190, 102 S.W.2d 1046, 1049 (1937).

The Texas Supreme Court has never directly rejected the holding of *Nevels,* however, it appears from the court's more recent reliance on the "separate and additional consideration test" in *Tony's Tortil-*

*la Factory, Goldring, Stedman, Ross, Freeman,* and even *Greever,* that fees paid directly to the lender can also be "bona fide" fees and thus not disguised interest.[11] This Court finds the watershed usury case to be *Stedman,* where the court held that a "(A) fee which commits the lender to make a loan at some future date does not fall within [the] definition (of interest)," thus allowing a lender to keep such fees without any reference that the fee had to go to a third party. 595 S.W.2d at 488 (citing *Freeman,* 534 S.W.2d at 906). The court went on to state that the commitment fee "entitles the borrower to a distinctly separate and additional consideration apart from the lending of money. Therefore, the lender may charge extra for this consideration without violating the usury laws." *Id.* If a lender can keep a "bona fide" fee, as it did in *Stedman,* without that fee going to a third party agent of the lender, it would appear that *Nevels* is no longer the bellwether for usury in Texas.[12]

**10.** While the *Esmond* court did not explicitly state the "separate and additional consideration" test, it did cite to *Tony's Tortilla Factory, Goldring,* and *Stedman* as support for its citation that "[a]mounts charged or received in connection with a loan are not interest if they are not for the use, forbearance, or detention of money." 960 S.W.2d at 627.

**11.** *But see Victoria Bank and Trust Co. v. Brady,* 811 S.W.2d 931, 936–37 (Tex.1991). Sandwiched between *Tony's Tortilla Factory* and *Goldring,* the *Victoria* court cited to two Texas Appeals Court cases and a United States Court of Appeals for the Fifth Circuit case, stating in pertinent part:

Lenders often require borrowers to pay expenses incurred by the lenders in connection with loans, such as title policy premiums, recording fees, costs of supplemental abstracts and attorneys' fees. When such expenses are actually incurred and they are paid in good faith to those furnishing the services, and no part of the payment is received by the lender, they are not properly classified as interest in determining whether the loan is usurious[; ...] Bona

fide fees paid to parties other than the lender ... are [not] characterized as interest[; ... and] Bona fide fees for services of this nature [fees for legal services and inspection of premises], paid to the lender's special agents and not participated in by the lender, are not considered as interest.

811 S.W.2d at 936–37. (citations omitted). While *Victoria* does give support to Plaintiff's contention that *Nevels* is the proper law to apply, the Texas Supreme Court's more recent opinion in *Tony's Tortilla Factory,* and the overwhelming weight of support from *Greever* to *Goldring,* all of which rely upon the "separate and additional consideration" test, leads this Court to believe that *Nevels* and *Victoria* do not provide the proper law to apply.

**12.** Giving support to Defendants' contention that the "separate and additional consideration" test is the proper test to apply is Justice Spears concurrence in *Goldring* which reads in pertinent part:

This court has held a plethora of charges can be added to the interest charged on an indebtedness without being charges for the

Harmonizing the *Nevels* opinion and the *Greever* line of cases up to *Tony's Tortilla Factory* reveals that fees which are in fact "bona fide," those that are not "for the use, forbearance, or detention of money," are not interest, whether they are paid directly to a lender's agent and thus the lender doesn't participate in the fees, or whether the fees are paid directly to the lender. The key is not the recipient of the fee, but what the fee is used for. If the fee is for "separate and additional consideration," it does not matter whether the lender retains the fee, as in *Stedman*, or whether the lender's agent gets the fee, as Plaintiff advocates that *Nevels* requires. Therefore, the key in determining whether a fee is interest or not, and what the Texas Supreme Court has consistently stated as such in its *Greever* line of cases, is whether the fee is for "separate and additional consideration." [13]

However, just because the fee is for "separate and additional consideration" does not end a court's inquiry, as the fee must also be "reasonable." In *Freeman*, the Texas Supreme Court stated that "whether or not a charge labeled a[fee] is merely a cloak to conceal usury may depend upon whether or not the fee is unrea-

sonable in light of the risk to be borne by the lender." 534 S.W.2d at 906. Three years later though in *Stedman*, the court's opinion failed to make a "reasonableness" calculation despite relying on its previous ruling in *Freeman* as precedent. 595 S.W.2d 486. In dissent, Justice Spears reminded the majority of the "reasonableness" calculation required by *Freeman*, and stated:

> [u]nder the majority's purblind holding in this case, a lender may now safely collect additional compensation for a loan up to the highest legal interest rate merely by contending that the charge was intended as a bona fide commitment fee. In fact, since the majority holds that such a charge cannot be the basis of a usury suit regardless of how unreasonable it might be, lenders could make charges greatly in excess of the legal interest rate.... This loophole effectively abrogates the statutory ceiling on interest rates.

*Id.* at 490–501 (Spears, J., dissenting). However, despite the *Stedman* majority's failure to make a "reasonableness" calculation, in *Tony's Tortilla Factory*, the Court cited *Freeman* and stated that "[w]hether a fee is interest or a service charge [de-

---

'use, forebearance or detention' of money. Each of these decisions, and this decision, extends the holding in [*Greever*] that so long as charges are for 'distinctly *separate and additional consideration* other than the simple lending of money' they are not interest.

665 S.W.2d at 104–06 (Spears, J., concurring) (emphasis added).

**13.** From an economic perspective, the holding in *Nevels* would lead to a result that the Texas Legislature did not intend when it promulgated the usury laws, which leads this Court to believe it is in fact disfavored by the Texas Supreme Court. The intent of the usury statutes was to prevent lenders from taking advantage of borrowers by charging them unconscionable interest rates, which could include disguised interest. However, to allow a

lender to escape any potential usury penalties by merely farming out its overhead, which would otherwise be interest, to a third party and having the borrower pay that agent directly, as *Nevels* allows, would provide lenders with an avenue to game the system and defeat the true intent of the usury statutes. *See generally* Douglas G. Baird, Robert H. Gertner & Randal C. Picker, *Game Theory and the Law* (1994) (game theory shows that the law can influence behavior by creating labels, which in turn creates the possibility of strategies based on those labels). The efficient approach is that provided by the "separate and additional consideration" test, which analyzes whether the fee is in fact "bona fide," regardless of who is in fact paid, whether it be the lender or the lender's agent. Therefore, following the *Nevels* approach would allow for an inefficient result.

pends upon] ... whether [the] fee is actually for an additional consideration ... or is merely a device to conceal usury." [14] 877 S.W.2d at 287. While the *Stedman* court did not explicitly depart from the "reasonableness" calculation by stating such a determination is no longer required, the *Tony's Tortilla Factory* court implicitly stated that a "reasonableness" calculation must be made to determine whether the fee is a "device to conceal usury." [15]

In determining whether a fee is "reasonable," the Texas Supreme Court stated in *Freeman* that a court must look to the "reasonableness" of the fee "in light of the risk to be borne by the lender." 534 S.W.2d at 906. In addition, in *Stedman*, Justice Spears listed a number of factors to consider in determining whether a fee is "reasonable":

> (1) what the committed funds would earn if invested elsewhere for the term of the commitment; (2) the risk to the lender that the yield on the loan as committed will be less favorable than that otherwise obtainable at the time of closing; (3) the value to the borrower of the availability of the funds; and (4) the expense, time, and trouble of investigating the loan application, provided no

separate charge for investigation is made.

*Stedman*, 595 S.W.2d at 492 (Spears, J., dissenting) (citing Sintenis, *Current Treatment of the Non–Refundable Commitment Fee and Related Problems*, 86 BANKING L.J. 590, 610 (1969) [hereinafter Sintenis] ). However, these "reasonableness" calculations were designed specifically for commitment fees, which, by their nature, do not have a normalized price associated with them. For the majority of fees charged by a lender, such as credit reports, background searches, lien searches, or field audits, the lenders at-cost price for those fees would be "reasonable." For example, if a lender charges a borrower $100 for a credit report which has an at-cost price of $75,[16] the $25 profit would be "unreasonable" and deemed to be interest. But it must be noted that the "reasonableness" calculation is in addition to the determination of whether the fee is "bona fide." Thus if a $100 credit report fee is "bona fide," but the lender only pays $75 for the report, the additional $25 would be interest irrespective of the "bona fide" nature of the fee.

Therefore, pursuant to the foregoing analysis, the proper test for determining

---

**14.** Defendant's counsel, believing that a "reasonableness" calculation does not have to be made for all fees in light of *Stedman*, argued that he could surely fathom a scenario whereby a "reasonableness" calculation would have to be made, as where a lender charged a $1,000,000 commitment fee for a $1,000 loan. Logically, if a "reasonableness" determination has to be made on the $1,000,000 fee, it must also be made on a $1,000 fee. Defendants' counsel, by his comments, presumes the $1,000,000 fee to be unreasonable because it is so high in light of the risk borne by the lender. However, the "reasonableness" determination is one that must be made by the Court. Defendants' presumption that the "reasonableness" calculation must only be made on the clearly unreasonable fee is incorrect.

**15.** Lending support to this analysis is the fact that the page in *Freeman* cited by the *Tony's Tortilla Factory* court reads in pertinent part: "whether or not a charge labeled a 'commitment fee' is merely a cloak to conceal usury may depend upon whether or not the fee is unreasonable in light of the risk to be borne by the lender." 534 S.W.2d at 906.

**16.** As stated previously in this Opinion, it is immaterial whether the lender or a third party keeps the fee. Under the "separate and additional consideration" test, the key is not the recipient of the fee, but what the fee is used for. Therefore, in the example given, it does not matter whether the credit report was done in-house for $75, or whether the lender paid an outside service $75 for the credit report.

whether a fee is disguised interest is a combination of the "separate and additional consideration" test, followed by a determination of the "reasonableness" of the fee to ensure it is not a "device to conceal usury."

### A. The Initial and Annual Facility Fees

Pursuant to the Loan Agreement, AIR was obligated to "pay to [Defendants] an *initial facility fee* in the amount of 1.50% of the Facility Limit, *payable on the date hereof,* ...." Loan Agreement § 2.7 (emphasis added). Thus, on June 30, 1998, the day that the Loan Agreement was executed, AIR paid $22,500 to Defendants in the form of an Initial Facility Fee.[17] Defendants argue that the Initial Facility Fee was a "bona fide" commitment fee that purchased an option to enter into the Loan Agreement. The Texas Supreme Court has stated "[w]hether an amount of money is interest depends not on what the parties call it but on the substance of the transaction." *Esmond,* 960 S.W.2d at 627 (citing *Freeman,* 534 S.W.2d at 906). In determining whether a fee is in fact a "bona fide" commitment fee, the stated in *Stedman* that "a fee which commits the lender to make a loan at some future date does not fall within [the] definition [of interest]. Instead, such a fee merely purchases an option which permits the borrower to enter into the loan in the future." *Stedman,* 595 S.W.2d at 488 (citing *Freeman,* 534 S.W.2d at 906). The court went on to state that a "bona fide" commitment fee "entitles the borrower to a distinctly separate and additional consideration apart

from the lending of money. Therefore, the lender may charge extra for this consideration without violating the usury laws." 595 S.W.2d at 488.

In the case *sub judice,* the facts are fundamentally different from those in *Stedman.* In *Stedman,* the plaintiff was not required to borrow any money from the lender, as the commitment fee only purchased an option to borrow in the future if the plaintiff chose to do so. *Id.* The facts in the case at bar are more like those in *Imperial Corp. of America v. Frenchman's Creek Corp.,* where the borrower was required by the loan agreement to pay a $67,000 commitment fee, a fee which was deducted from the initial advance of principal. 453 F.2d 1338, 1341 (5th Cir.1972). The District Court found the commitment fee to be interest, and the United States Court of Appeals for the Fifth Circuit affirmed that the fee was interest. *Id.* at 1344. As was in *Frenchman's Creek,* the Loan Agreement only required that AIR pay the Initial Facility Fee at closing. *See* Loan Agreement § 2.7. The Initial Facility Fee was not paid in advance of the Loan to hold an option open, but was only required as a condition precedent to the advance of principal under the Loan Agreement after the Loan had been entered into.[18]

Under Texas law, "to be valid and enforceable a contract establishing an option must be supported by consideration" and "if no consideration in fact passes, the option giver has power of revocation just as in the case of other revocable offers." *Echols v. Bloom,* 485 S.W.2d 798, 800 (Tex. Civ.App.1972). Thus, had Defendants

---

**17.** Of the Initial Facility Fee paid by AIR, $7,500 was paid directly and immediately to Merrill Lynch, with the balance of $15,000 paid to Defendants.

**18.** Section 3.2(ii) of the Loan Agreement reads in pertinent part: "[Defendants] shall

not be obligated to make any Advance hereunder (including the first), unless ... (ii)[AIR] has performed and complied with all agreements and conditions required in the Transaction Documents to be performed or complied with by it on or prior to the date of such Advance...."

promised to hold the Loan open, that promise would have been illusory as no consideration was given by AIR to hold the Loan open. *See Light v. Centel Cellular Co.,* 883 S.W.2d 642, 645 (Tex.1994) (a promise is illusory when it fails to bind the promisor, who retains the option of discontinuing performance). The Initial Facility Fee thus fails the "separate and additional consideration" test because AIR did not receive any consideration other than the simple lending of money. Because this Court finds that the Initial Facility Fee is not a "bona fide" commitment fee, it is not required to determine if the fee was "reasonable." Therefore, pursuant to *Esmond's* mandate to look beyond a fee's label and *Frenchman's Creek,* this Court deems the substance of the Initial Facility Fee to be interest.

 In addition, under the Loan Agreement, AIR was obligated to pay to Defendants "an *annual facility fee* in the amount 1.00% of the facility limit, payable on each anniversary of the date hereof during the Term." Loan Agreement § 2.7 (emphasis added). Defendants argue that the Annual Facility Fee was a "bona fide" fee for having the $1.5 million line of credit available during the three year term of the Loan Agreement. Despite the Annual Facility Fee never being charged to AIR, this Court must determine whether that portion of the Facility Fee was a "bona fide" fee or disguised interest in order to make a determination of whether the Loan Agreement is facially usurious. Once a lender agrees to enter into a loan, the lender is required to make the agreed amount of principal available to the borrower or be in breach of the loan. In addition, under Texas law, "[t]he discharge of a duty one is already bound to perform is not consideration." *Trevino & Gonzalez Co. v. R.F. Muller Co.,* 949 S.W.2d 39, 42 (Tex.App.—San Antonio 1997). Thus, if a lender is already obligated to have the agreed principal available to the borrower,

any agreement to hold open funds that the lender has already agreed to lend would fail for lack of mutuality of consideration. As such, the Annual Facility Fee is not a "bona fide" commitment fee, as the Loan Agreement had already been entered into, and thus no "separate and additional consideration," was given. Because this Court finds that the Annual Facility Fee is not a "bona fide" commitment fee, it is not required to determine if the fee was "reasonable." Therefore, this Court deems the Annual Facility Fee to be disguised interest.

### B. The Due Diligence Deposit

 Prior to Defendants' undertaking of the process to determine whether to enter into the Loan Agreement, AIR was required to make a Due Diligence Deposit (the "Deposit") of $15,000, which it did on August 7, 1997. Defendants used the Deposit to evaluate whether it would enter into the Loan Agreement, paying for expenses including credit reports, background searches, lien searches, and field audits. On July 1, 1998, the unused portion of the deposit was refunded to AIR in the form of a $2,442.25 credit.

Plaintiff argues that because Defendants kept the Deposit, and because Defendants are not in a business other than the lending business, the Deposit is interest as a matter of law. However, Plaintiff mistakenly relies on the *Nevels* holding that in order for a fee to not be deemed interest, the fee must be paid directly to a third party for services rendered, without the lender's participation in the fee. As stated previously, the test for whether a fee that is kept by a lender is interest or not is the "separate and additional consideration" test. Plaintiff cites *National Bond & Mortgage Corp. v. Mahanay,* 70 S.W.2d 236 (Tex.Civ.App.—Fort Worth 1934), *modified,* 124 Tex. 544, 80 S.W.2d 947 (1935), for the proposition that a borrow-

er's "deposit" with a lender for payment of "actual expenses" is in fact disguised interest. While the *Mahanay* court did find that the deposit was interest, the money received in the deposit was for "the actual expenses of printing bonds, having 'our note' guaranteed, compensation of 'the trustee,' handling collections, keeping records, keeping informed on taxes, and insurance" and not due diligence work. *Id.* at 236. Most importantly, the deposit in *Mahanay* was used for expenses post-closing, even though the money was paid pre-closing.

The fact scenario in *Mahanay* is fundamentally different from the one in the case at bar. Not only was AIR's Deposit was for pre-closing expenses, those expenses were for due diligence work to determine whether or not to enter into a loan with AIR and what remained of the Deposit at closing was refunded to AIR. Despite the *Mahanay* court not analyzing the deposit to determine if "separate and additional consideration" was given, as that test had yet to be promulgated by the Texas Supreme Court, no "separate and additional consideration" apart from the lending of money was given. While *Stedman* dealt with a "bona fide" commitment fee, that court's analysis is helpful in analyzing the Deposit in the case at bar. In *Stedman,* the borrower purchased an option to enter into a loan in the future, with the lender allowed to keep the fee whether or not the borrower actually entered into the loan or not. 595 S.W.2d at 488. The "separate and additional consideration" was the option to enter into the loan. *Id.* In the case *sub judice,* the "separate and additional consideration" was the due diligence work performed by Defendants.[19] In fact, a rational lender will not enter into an option to make a loan or enter into a loan without an option without first doing its due diligence, and as such a due diligence deposit would be a precursor to any commitment fee, or even the loan itself.[20]

19. Under Texas law, "[c]onsideration consists of benefits and detriments to the contracting parties" and "[i]t may consist of some right, interest, or profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss or responsibility that is undertaken or incurred by the other party." *Kunz v. Machine Repair and Maintenance, Inc.,* 2001 WL 1288995, *2 (Tex.App.—Houston [14th Dist.] 2001) (citations omitted). Whether or not a borrower and a lender enter into an option first, or just enter into a loan without the option, there is an interesting interplay of interests between the lender and the borrower as to whether a due diligence fee is "separate and additional consideration." On one hand, the borrower wants to enter into a loan, and thus initiates the contact with the lender, thus giving support for the due diligence deposit being "separate and additional consideration." It buys the lender's time and effort to decide whether or not it will enter the loan that the borrower wants. On the other hand, the lender wants to lend money to borrowers because that is how it makes money, and thus it must surely know that it will have to perform some type of due diligence before it is going to lend money, thus giving support for a due diligence deposit not being "separate and additional consideration," because the lender is not suffering a detriment. Ultimately, the borrower's desire to enter into a loan motivates the interest the lender has in lending money, and thus the initiation of the contact by the borrower places the burden upon the lender to perform its due diligence, and thus supplies the "separate and additional consideration" for the due diligence fee.

20. This should in no way be construed to say that all due diligence fees are "bona fide" fees. Any due diligence work performed after the borrower and lender enter into a loan would also have to be for "separate and additional consideration" for it not to be deemed interest. Under *Mahanay,* 70 S.W.2d at 236, due diligence work performed by the lender after execution of the loan would be considered overhead and thus interest, unless the borrower and lender entered into a collateral agreement for something other than the initial loan itself, which in turn would require due diligence work be performed.

■ While no Texas court has promulgated any factors to apply in determining whether a due diligence deposit is a "bona fide" fee, in *Stedman,* Justice Spears provided in his dissent a list of factors to consider in determining whether a fee is a "bona fide" commitment fee:

(1) what expenses the fee is designed to defray; (2) whether the amount of the fee is dependent on the amount of the loan or the risk of the enterprise being financed; (3) whether the fee is a one-time charge or is assessed throughout the life of the loan; (4) whether the fee is charged on the entire committed amount regardless of the size and period of the outstanding balances; and (5) the difference between the lender's internal accounting treatment of the fee and that of interest.

595 S.W.2d at 495 (Spears, J., dissenting) (citing *Fikes v. First Federal Savings and Loan Association,* 533 P.2d 251, 265 (Alaska 1975)). This Court finds factors (1), (3) and (5) to be persuasive,[21] and adopts those factors as (A), (B), and (E) respectively. In addition to those factors adopted from *Stedman,* this Court adds two additional factors: (C) whether the due diligence deposit was charged regardless of whether the lender loaned any money or not; and (D) whether the due diligence deposit was a separate charge in addition to a commitment fee.[22] Therefore, in considering whether "separate and additional consideration" has been given, a Court should evaluate a due diligence deposit under the following factors:

(A) what expenses the due diligence deposit is designed to defray; (B) whether the due diligence deposit is a one-time charge or is assessed throughout the life of the loan; (C) whether the due diligence deposit was charged regardless of whether the lender loaned any money or not; (D) whether the due diligence deposit was a separate charge in addition to a commitment fee; and (E) the difference between the lender's internal accounting treatment of the due diligence deposit and that of interest.

Applying factor (A), the Deposit was intended to defray Defendants' costs for credit reports, background searches, lien searches, and field audits used in determining whether to make the Loan. Under factor (B), the Deposit was only a one-time charge for expenses prior to the Loan even being offered, and not a charge that was to be assessed throughout the contracted-for three year term of the Loan Agreement. Applying factor (C), the Deposit was charged to AIR regardless of whether a loan was later entered into or not, which as the foregoing analysis provided, was also the case with the commitment fee in *Stedman.* Under factor (D), and as previously stated in this Opinion, no "bona fide" commitment fee was charged by Defendants, thus it would be appropriate to charge a separate fee for the Deposit. Finally, applying factor (E), Defendants internally accounted for the Deposit as a "new business deposit" and placed it in its deposit account for prospective clients. In con-

---

**21.** This Court rejects factors (2) and (4) as they pertain specifically to commitment fees.

**22.** In *Stedman,* Justice Spears stated that, in determining whether a "bona fide" commitment fee is "reasonable," a court must look at "the expense, time, and trouble of investigating the loan application, *provided no separate charge for investigation is made."* 595 S.W.2d at 492 (Spears, J., dissenting) (emphasis added) (citing Sintenis at 610). This does not

mean that a due diligence deposit can never be a stand alone "bona fide" fee, only that if a "bona fide" commitment fee is paid by the debtor, any due diligence work must be included within the fee and can not be charged separately. Therefore, by negative implication, if a commitment fee is not charged to the debtor, any due diligence work could be "bona fide" if the fee is for "separate and additional consideration."

trast, the interest that Defendants charged to AIR was listed as interest on Defendants' Interest Statements. Upon application of factors (A) through (E), this Court finds the Deposit to be for "separate and additional consideration," and thus not disguised interest.

■■■ Having determined that the Deposit was for "separate and additional consideration," the Court now turns to determining whether the Deposit was "reasonable," and not a "device to conceal usury." As Exhibit 1 attached to this Opinion shows, the Deposit was used for the following: $7,821.05 was for Field Audit fees, $1,168.94 for Background Search fees, $204.40 for Delivery fees, $265 for "CRBUR" fees, $420 for "D & B" fees, $2,341.51 for UCC Search fees, $136.85 for Phone fees, and $200 for an Appraisal. These fees within the Deposit were charged to AIR at an at-cost value. Defendants did not add any profit to the fees, but only charged AIR what they themselves paid for the services. In addition, Defendants returned the remainder of the Deposit to AIR after the expenses under the Deposit were made, which if the remainder had been retained, the $2,442.25 left over would have been interest. Because the fees within the Deposit were charged at-cost, the Deposit is deemed to be "reasonable" and thus not a "device to conceal usury."

Therefore, since the Deposit was for "separate and additional consideration," and the Deposit is also "reasonable" as the fees within the Deposit were charged at-cost, the entire Deposit is a "bona fide" fee and thus not disguised interest.

### C. The Attorney's Fees

■■■ Pursuant to the Loan Agreement, AIR agreed to also pay all attorney's fees connected with the Loan. The Loan Agreement specifically stated that "[c]ontemporaneously with the execution and delivery hereof, [AIR] shall pay to [Defendants] a fee of $12,500 plus out-of-pocket expenses to cover the legal costs of the negotiation, preparation, execution and delivery of the Transaction Documents" and "[AIR] shall pay or reimburse [Defendants] upon demand for all other costs and expenses ... including ... attorney's fees...." Loan Agreement § 2.11. The total of $15,094.05 in Attorney's Fees charged by Defendants were for documentation and real estate legal services related to the Loan Agreement, with $2,594.05 paid directly to the law firm of Thompson & Knight, Defendants' outside counsel, and $12,500 paid directly to Defendants' in-house counsel.

While it is Defendants' contention that attorney's fees are consistently excluded from any calculation of interest, this proposition is not correct. See Frenchman's Creek, 453 F.2d at 1343; Sapphire Homes, Inc. v. Gilbert, 426 S.W.2d 278, 284 (Tex. Civ.App.—Dallas 1968, reh'g denied). In both Frenchman's Creek and Gilbert, the United States Court of Appeals for the Fifth Circuit and the Texas Court of Civil Appeals, respectively found that "bona fide" fees for legal services, paid to those rendering the service, and where the lender does not participate in the fees, are not considered interest. However, both these decisions came prior to the Texas Supreme Court's more recent ruling in Stedman, where a lender was allowed to keep a fee that was determined to be for "separate and additional consideration." 595 S.W.2d at 488. Therefore, in light of Stedman, both Frenchman's Creek and Gilbert's findings that a lender can not participate in a fee in order for it to be "bona fide" and not interest are superceded, thus offering no support for Defendants' contention that attorney's fees are not interest as a matter of law.

Because both Frenchman's Creek and Gilbert are not applicable, Defendants' only support for attorneys' fees not being

interest is *Goldring*. However, *Goldring* can be distinguished from the facts in the case at bar. The Texas Supreme Court held in *Goldring* that attorney's fees can be "consideration in addition to the simple lending of money, and thus ... not interest." 665 S.W.2d at 104. In *Goldring*, the lender hired attorneys to quiet title to property that was the subject of a previous loan with the borrower, and when the borrower refinanced the property the lender included the attorney's fees in the new loan amount, which was not determined to be interest. 665 S.W.2d at 103–04. While Justice Spears' concurrence in *Goldring* stated that "if another label can be applied to the charge, it isn't interest in the eyes of the law[,] ... even though the nexus of the transaction is the making of the loan, and without a loan, there would be no occasion to make any charges at all," this is in fact misleading. 665 S.W.2d at 106 (Spears, J., concurring). The nexus of the attorney's fees in *Goldring* was not the making of the loan, as the fees were incurred prior to the loan being entered into, and were not incurred on account of that loan. *Id.* at 103–04. The present case is fundamentally different from *Goldring*, as the nexus of the Attorney's Fees charged to AIR was the Loan, and without the Loan, "there would [have] be no occasion to make [the] charges at all." Thus, no "separate and additional consideration" was given for the Attorney's Fees. Because this Court finds that the Attorney's Fees are not "bona

fide" fees, it is not required to determine if those fees were "reasonable." Therefore, this Court deems the $15,094.05 AIR paid in Attorney's Fees, split between Defendants' inside and outside counsel,[23] to be disguised interest.

### D. The Collateral Monitoring Fee, Audit Fee and Other Additional Expense Reimbursements

■ Pursuant to the Loan Agreement, AIR was obligated to pay "[Defendants] a collateral monitoring fee in the amount of $1,500 for each calendar month." Loan Agreement § 2.9. The Collateral Monitoring Fee (the "Monitoring Fee") was to reimburse Defendants for expenses incurred in evaluating, inspecting, and analyzing AIR's collateral in connection with the Loan. In addition, the Loan Agreement required that AIR pay an Audit Fee for the "costs associated with any such audits [of AIR's collateral, books and records by [Defendants'] appraisers, auditors or accountants,] at the rate of $700 per day per auditor plus reasonable out-of-pocket expenses." Loan Agreement § 5.2. Finally, the other Additional Expense Reimbursements (the "Expense Reimbursements") included in the Loan Agreement were to reimburse Defendants for expenses incurred in connection with the execution and processing of the Loan.[24]

Defendants cite *Nevels* for the proposition that inspection and audit fees are "bona fide" fees and not interest, and

23. The Texas Supreme Court has only held that "bona fide" legal fees are not interest, but it has not addressed whether any distinction should be made between fees paid to inside versus outside counsel. *See e.g. Esmond*, 960 S.W.2d at 627; *Tony's Tortilla Factory*, 877 S.W.2d at 287; *Goldring*, 665 S.W.2d at 104. Therefore, in the absence of such a legal distinction, none shall be made. In addition, pursuant to this Court's rejection of *Nevels* as the true test for usury, Plaintiff's belief that the $2,594.05 paid directly to the law firm of Thompson & Knight is not interest

under *Nevels* is in error. As such, both the $2,594.05 paid to the law firm of Thompson & Knight, Defendants' outside counsel, and the $12,500 paid to Defendants' in-house counsel are deemed disguised interest.

24. The Additional Expense Reimbursements include: Lockbox Fee, Check Copy Fee, WTF Fee, Search Fee, Delivery Fee, D & B Fee, Phone Fee, Postage Fee, UCC Fee, "CKCOP" Fee, "Rtnfee" Fee, "Rtnck" Fee, and Minimum Usage Fee.

again relies upon *Frenchman's Creek*, which cited *Nevels*, for the proposition that fees charged for inspection of the premises as work progresses are "bona fide" fees and should not be considered interest. However, both of these cases found that "bona fide" fees paid to a lender's special agents are not interest only if the lender does not participate in the fee. *See Nevels*, 102 S.W.2d at 1048–49; *Frenchman's Creek*, 453 F.2d at 1343. In addition, Defendants cite *Sapphire Homes, Inc. v. Gilbert*, 426 S.W.2d 278 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.), for the proposition that overhead for a loan is not interest. In *Gilbert*, the court stated that "expenses incurred by the lenders in connection with loans, such as title policy premiums, recording fees, [and] costs of supplemental abstracts[, are not interest] ... [w]hen such expenses are actually incurred and they are paid in good faith to those furnishing the services, and no part of the payment is received by the lender." *Id.* at 284. However, *Nevels, Frenchman's Creek*, and *Gilbert* can all be distinguished because they preceded the Texas Supreme Court's opinion in *Stedman*, where the court determined that a lender could keep a fee if it was for "separate and additional consideration." 595 S.W.2d at 488.[25]

As the Texas Supreme Court has consistently held, for a fee to be "bona fide," it must be analyzed to determine if "separate and additional consideration" was given.

In the case at bar, the Monitoring Fee, Audit Fee, and Expense Reimbursements were not for "separate and additional consideration." Defendants argue that if a fee is charged for inspecting or copying and the actual inspection or copying is made, then that satisfies the "separate and additional consideration" test. This is a gross mis-characterization of what "separate and additional consideration" is. In fact, another case cited by Defendants, *Tony's Tortilla Factory*, 877 S.W.2d 285, clearly illustrates how the test works. In *Tony's Tortilla Factory*, the court found that an NSF fee charged was not interest on the amount advanced to cover the bad check, but was "separate and additional consideration" to cover the additional work required for processing each bad check, and thus was not interest. *Id.* at 287–88. The court found the separate consideration to be the funds advanced to cover the bad check and the debtor's implied promise to repay that advance. *Id.* at 288.

In contrast to *Tony's Tortilla Factory*, the Monitoring Fee, Audit Fee, and Expense Reimbursements charged to AIR were for services and overhead incidental to the Loan Agreement.[26] The fees charged to AIR were part and parcel of the Loan Agreement and only arose as an incident to the lending of money, with the nexus of the fees being the making of the Loan.[27] Without the Loan, there would have been no occasion to charge the fees at

---

**25.** It should be noted that *Nevels, Frenchman's Creek*, and *Gilbert* do not advance Defendants' argument that the Monitoring Fee, Audit Fee, and Expense Reimbursements are "bona fide" fees, since there has been no showing by Defendants that the fees were in fact paid to third parties.

**26.** In fact, the Minimum Usage Fee was pure interest. Under the Loan Agreement, if the interest per month was "less than $10,600 (or, during the months of October through March, $9,100)," AIR was obligated to pay the difference to the Defendants in the form

of a Minimum Usage Fee. *See* Loan Agreement § 2.8. Therefore, the Minimum Usage Fee guaranteed to Defendants a certain amount of profit for each month, and is thus interest.

**27.** *See* Scott G. Night & Terry W. Connor, *Overview of Texas Usury Laws and Recurring Usury Problems*, 36–SPG Tex.J.Bus.L. 1, 18 (1999) ("Charges to the borrower for services normally incident to the making of the loans and for the lender's overhead expenses are ordinarily deemed interest for the purpose of determining usury, e.g., handling charges,

all, and as such, no "separate and additional consideration" was given.[28] Because this Court finds that the Monitoring Fee, Audit Fee, and Expense Reimbursements are not "bona fide" fees, it is not required to determine if those fees were "reasonable." Therefore, this Court deems the Monitoring Fee, Audit Fee, and Expense Reimbursements to be disguised interest.

### 2. Acceleration of Loans Under Texas Law and the Bankruptcy Code

■ Defendants argue that because the Loan Agreement states that the Loan's term would end on June 30, 2001, any applicable interest must be spread over the course of the contracted-for three year term. The Texas Supreme Court has stated that all applicable interest must be spread over the entire term of the loan. *See Tanner Dev. Co., v. Ferguson*, 561 S.W.2d 777, 786–87 (Tex.1977); *see also Frenchman's Creek*, 453 F.2d 1338. However, a loan's term may be shortened, in spite of the contracted-for term, thus causing interest to be spread over a shorter term. Texas courts have listed two avenues for a loan's term to be accelerated, and thus shortened: (1) where the borrower pays off the loan before the end of its term, *Pentico v. Mad Wayler Inc.*, 964 S.W.2d 708, 715 (Tex.App.—Corpus Christi 1998, pet. denied); *Coppedge v. Colonial Sav. and Loan Ass'n*, 721 S.W.2d 933, 937 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); or (2) where the lender accelerates the loan. *See Armstrong v. Steppes Apartments Ltd.*, 57 S.W.3d 37, 48 (Tex.App.—Fort Worth 2001). In the case at bar, AIR did not pay off the Loan prior to the end of its contemplated term, thus the only avenue for shortening the Loan's term would be through acceleration by Defendants.

■ In *Armstrong*, the court stated that "when a note is accelerated the term of the loan is shortened," meaning that the interest charged must be spread over the period from closing to acceleration. 57 S.W.3d at 48. Though the facts in *Arm-*

---

carrying charges, inspection fees, service charges, and storage fees."). Deeming overhead to be interest would appear to be the efficient outcome. If charges and overhead were not considered interest, then the lender could ensure an eighteen percent profit by charging any overhead as disguised fees. This is clearly not what the Texas legislature had in mind when it capped the maximum interest rate at eighteen percent. Therefore, the lender must include its overhead in the cushion between the interest rate charged under the loan and the maximum rate of eighteen percent.

**28.** This highlights the fundamental problem with placing arbitrary limits on interest rates as usury statutes do. In a free market, a willing buyer and willing seller come to terms that are amicable to both parties. However, in the usury world, the parties can only come to an agreement where the interest rate does not exceed what the legislature has deemed to be the maximum rate. This presents a problem for creditors who lend to distressed companies. The distressed debtor comes with certain baggage that makes it a higher credit risk, and as such, the lender will not only want to charge a commensurate interest rate for the risk, it will also want to perform such services as continued monitoring of the debtor's collateral to determine whether to advance additional principal. Therefore, when collateral monitoring fees are deemed to be interest, if they are not for "separate and additional consideration," this pushes the interest charged towards the interest ceiling. If the lender has to bear these fees itself, and the maximum interest rate is below what is needed to not only cover the lender's risk, but also those fees necessary for the distressed borrower, lenders will decline to lend to high risk debtors. Therefore, usury laws could effectively exclude high risk borrowers from credit markets because the lender is required to bear the costs of lending to the high-risk borrower, thus actually hurting them, more than helping them. *See generally* Todd J. Zywicki, *The Economics of Credit Cards*, 3 Chap.L.Rev. 79 (2000) (where usury rates constrain interest rates they also constrain access to credit and create other market distortions).

*strong* regarding the acceleration are somewhat lacking, the lender did accelerate the amounts due under a note by sending the borrower notice of intent to exercise the loan's option to accelerate. *Id.* at 43. But while the defendant in *Armstrong* affirmatively accelerated the loan, Defendants allege that they did not accelerate the Loan Agreement. Therefore, this Court must analyze whether the Loan Agreement was accelerated, either by the express terms of the Loan Agreement, by operation of bankruptcy law, or by the affirmative action of the Defendants

### A. Acceleration Clauses as Ipso Facto Clauses Under 11 U.S.C. § 365(e)(1)

 Plaintiff believes that the Loan Agreement was automatically accelerated by its terms, and thus the interest received by Defendants should be spread over the shorter period from closing to bankruptcy. *See Armstrong*, 57 S.W.3d at 48. Under the Loan Agreement, upon the filing of bankruptcy, "all of the Obligations owing by [AIR] to [Defendants] under any of the Transaction Documents shall thereupon be *immediately due and payable*, without demand, presentment, notice of demand or of dishonor and nonpayment, or any other notice or declaration of any kind, all of which are hereby expressly waived by [AIR]." Loan Agreement § 9 (emphasis added). While the majority of the Events of Default under the Loan Agreement gave Defendants the option of acceleration, Defendants carved out an exception to optional acceleration and allowed for automatic acceleration upon the filing of bankruptcy.[29]

Under the Bankruptcy Code, clauses that terminate or modify a debtor's rights in an executory contract upon the filing of a bankruptcy petition are generally rendered unenforceable, and are known as *ipso facto* clauses. Section 365 of the Code provides in pertinent part:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—(B) the commencement of a case under this title;....

11 U.S.C. § 365(e)(1).[30] In applying 365(e)(1), courts have stated that "[n]o de-

---

29. The Texas Supreme Court has "held that, as a rule, acceleration provisions must be clear and unequivocal." *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 893 (Tex.1991) (citing *Ramo, Inc. v. English*, 500 S.W.2d 461, 466 (Tex.1973); *Motor and Indus. Fin. Corp. v. Hughes*, 157 Tex. 276, 302 S.W.2d 386, 394 (1957)). In addition, the court stated that "[i]f the meaning of a term in an acceleration clause is open to reasonable doubt, it should be construed to avoid acceleration." *Shumway*, 801 S.W.2d at 893 (citing *Ramo*, 500 S.W.2d at 466). Here, the acceleration provision is both "clear and unequivocal" and not "open to reasonable doubt." It is clear from the face of the Loan Agreement that Defendants considered there to be two categories of Events of Default, those that allowed for optional acceleration, and those that resulted in automatic acceleration. In fact, the Loan Agreement delineated these two classes as it provided that "[a]fter any such acceleration (whether automatic or due to declaration by [Defendants]), any obligation of [Defendants] to make any further Advances of loans of any kind under this Agreement or any other agreement with [AIR] shall terminate." Loan Agreement § 9.

30. For 11 U.S.C. § 365(e)(1) to apply, the Loan Agreement must be an executory contract under the auspices of the Code. The Code does not provide an express definition of an executory contract, however, the legislative history of 365(a) shows that Congress' intent was for the term to mean a contract "on which performance is due to some extent on both sides." H.R.Rep. No. 95–595, p. 347

fault may occur pursuant to an *ipso facto* clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case." *In re Chateaugay Corp.*, 1993 WL 159969, *5 (S.D.N.Y. 1993).[31]

The facts in the case at bar are very similar with those in *Chateaugay*, where the sole allegation concerning the debtor's default was that it had filed for protection under the Code. 1993 WL 159969 at *5. The court found that no default was triggered because the *ipso facto* clause was unenforceable and thus could not be considered an event of default. *Id.* The court opined that to permit the plaintiffs to recover would effect a modification of the contract due solely to the debtor's bankruptcy. *Id.* In its analysis, the court distinguished those cases where a party was permitted to recover under a default, however, in those cases, the debtor was in default for reasons other than the mere filing of a bankruptcy petition. *Id.* (citing *In re Bullock*, 17 B.R. 438, 439 (9th Cir. BAP 1982); *In re Diamond Head Emporium, Inc.*, 69 B.R. 487, 496 (Bankr.D.Hawaii.1987)).

In the case *sub judice*, Plaintiff's sole argument concerning whether the Loan was accelerated is that the terms of the Loan Agreement affirmatively accelerated the Loan upon the filing of bankruptcy. As section 365(e)(1) and *Chateaugay* demonstrate, if the only Event of Default that is deemed to have occurred is AIR's filing of bankruptcy, then there has been no default and the Loan Agreement was therefore not accelerated. There is a slight factual difference from *Chateaugay* and the majority of cases applying 365(e)(1) in that here, the lender is using it as a defense to acceleration, while typically the defense is used by the debtor to prevent the lender from accelerating. However, whether the lender or the debtor is using 365(e)(1) as a defense, the Code clearly states that *ipso facto* clauses are unenforceable and thus can not be considered as an event of default. Therefore, the Loan Agreement was not accelerated upon AIR's filing of bankruptcy.

### B. The Filing of the Bankruptcy Petition and Acceleration

■ Plaintiff also argues that under bankruptcy law, it doesn't matter if a loan

---

(1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6303, *see* S.Rep. No. 95–989, p. 58 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844. The Fifth Circuit Court of Appeals has stated that an executory contract "is one that is still unperformed by *both* parties or one with respect to which something still remains to be done on *both* sides." *Marre v. U.S.*, 117 F.3d 297, 308 n. 19 (5th Cir.1997) (quoting *Lee v. Cherry*, 812 S.W.2d 361, 363 (Tex.App.—Hous. [14th Dist.] 1991, reh'g of writ overruled)). Using these definitions as guidance, it is clear that the outstanding obligations of both Defendants, to continue to loan principal to AIR based on AIR's accounts receivable and inventory under the Borrowing Base formula, and AIR, to pay back the principal and interest loaned by Defendants, amounted to the Loan Agreement being an executory contract for purposes of the Code.

**31.** *See also Lyons Savings & Loan Association v. Westside Bancorporation, Inc.*, 828 F.2d 387, 393 n. 6 (7th Cir.1987) ("365(e) of the Bankruptcy Code invalidates *ipso facto* or bankruptcy termination clauses which permit one contracting party to terminate or even modify an executory contract or unexpired lease in the event of the bankruptcy of the other contracting party."); *In re Monica Scott*, 123 B.R. 990, 992 n. 6 (Bankr.D.Minn. 1991) ("Insolvency and bankruptcy clauses typically define default to include insolvency or the filing for bankruptcy protection. The clauses are not enforceable in bankruptcy."); *In re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y.1987) ("A termination or modification clause in a contract which is triggered by the filing of a bankruptcy case is expressly denounced and is unenforceable . . .").

is accelerated by its terms or the lender affirmatively accelerates the loan, a loan is deemed accelerated upon the filing of a bankruptcy petition. Plaintiff cites *In re Manville Forest Products Corp.*, for the proposition that "[b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor," whether the lender affirmatively accelerated the loan or not. 43 B.R. 293, 297–98 (Bankr.S.D.N.Y. 1984), *rev'd on other grounds*, 60 B.R. 403 (S.D.N.Y.1986).

In *Manville*, the debtor had debt outstanding under the terms of a number of loans, all of which contained optional acceleration clauses with the filing of bankruptcy being an event of default. *Id.* at 295. Only one of the lenders actually notified the debtor of its default under the loan, however at trial, the lenders who did not exercise the optional acceleration clause argued that the loans were automatically accelerated upon the debtor filing its bankruptcy petition. *Id.* at 295–97. The court construed 11 U.S.C. § 101(4)(a), the definition of a claim, and § 502, which allows for claims that are unmatured or contingent, to reach the conclusion that "[t]he debt was automatically accelerated upon the filing of the petition," despite that fact that the lender did not affirmatively accelerate the loan. *Id.* at 298. But what the court found most persuasive was the House and Senate Report with respect to 11 U.S.C. § 502(b), which stated that "[b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor." [32]

This Court does not find *Manville* to be persuasive, and thus rejects its finding

that bankruptcy serves to accelerate a loan. There is a difference between the "acceleration of a debt for bankruptcy purposes," such as the filing of a proof of claim, and "acceleration for enforcement of a debt." *See Mundaca Investment Corp. v. Dickerson*, 1991 WL 175701, *1 (Tenn. Ct.App.1991). Acceleration is a term of art that has a distinct meaning. Acceleration is defined to mean "[t]he advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately." BLACK'S LAW DICTIONARY 11 (7th ed.1999). Therefore, "acceleration" is in fact only "acceleration for enforcement of a debt," and not the "acceleration of a debt for bankruptcy purposes" variation that *Manville* attaches to the definition. Other courts have also come to this same conclusion. *See In re PCH Associates*, 122 B.R. 181 (Bankr.S.D.N.Y.1990); *In re Metro Square*, 1988 WL 86679 (Bankr.D.Minn. 1988); *In re Texaco Inc.*, 73 B.R. 960.

In *PCH Associates*, the court, looking at the same legislative history that the *Manville* court did, noted that there was "a distinction between acceleration of a debt upon the filing of the bankruptcy petition for the purpose of the filing of a proof of claim in a case … and acceleration for the purpose of taking actions against a debtor in violation of the automatic stay." 122 B.R. at 198 (citations omitted). In *Metro Square*, the court stated that "[a] creditor is allowed to file a claim for the full amount of an unmatured debt owed by the debtor however, under 11 U.S.C. § 362(a), the creditor is prevented from taking overt steps to accelerate the debt, including sending notices of default." 1988 WL 86679 at *2.

---

**32.** The House and Senate Reports both read in pertinent part:

Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second,

bankruptcy operates as an acceleration of the principal amount of all claims against the debtor. . . .

Sen.Rep No. 989, 95th Cong., 2nd Sess. 63 (1978); H.R.Rep. No. 595, 9th Cong.1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5849, 6309.

Finally, in *Texaco*, certain note holders sought relief from the stay in order to serve notices of acceleration on the debtor. *Id.* at 963–64. The note holders, citing *Manville*, argued that the notes, which contained *ipso facto* clauses, had been automatically accelerated by bankruptcy law, and thus they had cause to lift the stay. *Id.* at 965. However, the court, looking at the same legislative history that the *Manville* court relied upon, stated that automatic acceleration upon the filing of a bankruptcy petition "is taken out of context from the legislative history with respect to 11 U.S.C. § 502(b), which deals with the allowance of claims or interests." *Id.* at 965–66. The court went on to state that "[t]he commencement of a case under title 11, without more, cannot be regarded ... as sufficient cause for relief from the automatic stay imposed under [362(a)]." *Id.* at 967.

What *PCH Associates, Metro Square* and *Texaco* demonstrate is that bankruptcy may accelerate the Loan, however, this acceleration is only for the limited purpose of calculating Defendants' claim in the bankruptcy, which includes unliquidated amounts. While the *Manville* court did state that "[b]ankruptcy operates as [an] acceleration of ... principal," 43 B.R. at 297–98, this is clearly not the same as an "acceleration for enforcement of a debt." Since a creditor can not accelerate and attempt to collect on a loan due to 11 U.S.C. § 362(a)(6), which in turn would preclude it from filing a claim for an accel-

erated amount, the *Manville* court found that bankruptcy law automatically accelerates a loan, absent any affirmative act by the creditor. As the court posited, this "allows a creditor to file a claim for the full amount of an unmatured debt owed by the debtor" despite the fact that it can't collect the debt due to the stay. *Id.* at 298.

Giving further support to this Court's belief that the filing of a bankruptcy petition does not accelerate a loan, is the Fifth Circuit Court of Appeals opinion in *Greenhouse Patio Apartments v. Aetna Life Insurance Co.*, 868 F.2d 153 (5th Cir.1989). The Circuit, in dealing with the issue of whether a promissory note, with an optional acceleration provision, had been accelerated or not, did not find that a note becomes automatically accelerated upon a debtor filing for bankruptcy, and didn't even mention the *Manville* opinion. *Id.* at 155–56.[33] In *Greenhouse*, the Circuit was specifically looking for an act of acceleration, as acceleration was the lynchpin in the Plaintiff's usury suit.[34] *Id.* at 154. While the Circuit did not explicitly state that the filing of a bankruptcy petition does not automatically accelerate a note, the fact that it was looking for an act of acceleration and found that acceleration had not occurred, implicitly rejects any notion that bankruptcy automatically accelerates a loan.

Whereas *Manville* was looking at "acceleration for bankruptcy purposes," the Fifth Circuit's *Greenhouse* opinion is clearly looking at "acceleration for enforcement

---

**33.** Plaintiff argues that *Greenhouse* is inapplicable, as in that case the note at issue contained an optional acceleration provision, whereas in the case at bar, the Loan Agreement contains an automatic acceleration provision. As this Court stated previously in this Opinion, the automatic acceleration provision is an *ipso facto* clause and thus unenforceable. Therefore, *Greenhouse* is applicable as to whether or not the filing of a bankruptcy

petition serves as an automatic acceleration of principal.

**34.** The *Greenhouse* plaintiff's claim was "based on the premise that charging a prepayment obligation is wrongful if acceleration has occurred, under the principals enunciated in *In re LHD Realty*, 726 F.2d 327, 330 (7th Cir.1984)," 868 F.2d at 154. Therefore, if acceleration did not occur, then the plaintiff could not support its cause of action.

of a debt," which it found did not occur. The Circuit applied the Texas law set forth in *Ogden v. Gibraltar Sav. Ass'n,* 640 S.W.2d 232 (Tex.1982), and *Dillard v. Freeland,* 714 S.W.2d 378 (Tex.App.—Corpus Christi 1986), and stated that the mere "filing [of] a proof of claim including the full amount of the principal plus other charges does not show an intent to accelerate." [35] *Id.* at 155–56. The Circuit looked to the same Code sections that the *Manville* court did, §§ 101(4)(A) and 502, and stated that a "proof of claim should properly include unmatured obligations, and filing such a claim does not cause acceleration." *Id.* at 156. This is a rejection of any interpretation that bankruptcy automatically accelerates a loan, and thus Plaintiff's contention that Defendants' filing of its proof of claim for the entire amount of the debt was an admission that it had accelerated the debt is not supported by the law in the Fifth Circuit.

The Fifth Circuit *Greenhouse* opinion explicitly echoes what *Manville* correctly stands for, and that is that filing a proof of claim for an accelerated amount is not an "acceleration for enforcement of a debt" purposes, and implicitly rejects any notion that the filing of a bankruptcy petition accelerates a loan for "enforcement of a debt" purposes. This supports this Court's belief that there is a difference between the "acceleration of a debt for bankruptcy purposes" and "acceleration for enforcement of a debt." In light of *Greenhouse,* this Court finds that *Manville* only stands for the proposition that a creditor can file a proof of claim for the accelerated amount of a loan and not be in violation of the stay, and nothing more. Therefore, Plaintiff's reliance on *Manville's* statement that "[b]ankruptcy oper-

ates as [an] acceleration of … principal" is misplaced, as the filing of a bankruptcy petition does not accelerate a loan.

### C. *Optional Acceleration of Loans Under Texas Law*

Because the Acceleration Clause was an *ipso facto* clause and thus unenforceable, and the Loan Agreement was not automatically accelerated upon the filing of a bankruptcy petition, the only other option for the Loan Agreement to be accelerated is if Defendants affirmatively exercised its option to accelerate. Apart from the *ipso facto* clause, the Loan Agreement also stated that if ever "[t]here shall be commenced by or against [AIR] … any voluntary or involuntary case under the federal Bankruptcy Code[,]" "[Defendants] shall have no further obligation to make any further Advances and *may* immediately exercise [their] rights and remedies with respect to the Collateral under this Agreement, the Uniform Commercial Code and applicable law." Loan Agreement § 9(d) (emphasis added).

■■■■ In analyzing optional acceleration clauses, the Texas Supreme Court has stated that where a lender has the option of acceleration and desires to exercise that option, "equity demands notice be given of the intent to exercise the option." *Ogden,* 640 S.W.2d at 233. "Notice of intent to accelerate is necessary in order to provide the debtor an opportunity to cure his default prior to the harsh consequences of acceleration and foreclosure. Proper notice that the debt has been accelerated, in the absence of a contrary agreement or waiver, cuts off the debtor's right to cure his default and gives notice that the entire debt is due and payable." *Id.* at 234. However, "[n]otice that the debt has been

---

**35.** In addition, the Circuit stated that the lender did not even "manifest an intent to accelerate by seeking adequate protection for the full amount of [the] debt," nor did its attempts to seek all unpaid amounts rather than past due amounts equivocally evince acceleration. *Greenhouse,* 868 F.2d at 154.

accelerated ... is ineffective unless preceded by proper notice of intent to accelerate." *Id.* Therefore, in order for the lender to accelerate, it must "make a clear, positive, and unequivocal declaration in some manner of the exercise of that right." *Dillard,* 714 S.W.2d at 380.

■ In the case at bar there is no evidence at all that Defendants ever gave notice of the intent to accelerate AIR's debt. In fact, had Defendants actually accelerated the debt and attempted to enforce the claim without receiving relief from the automatic stay, it would have been in violation of the stay. *See* 11 U.S.C. § 362(a)(6). The only evidence produced by Plaintiff that may be interpreted as evidencing an intent to accelerate the Loan Agreement was Defendants' Cure Letters evincing Defendants' belief that the Loan Agreement had become usurious. However, pursuant to *Ogden* and *Dillard,* these Cure Letters do not clearly, positively, and unequivocally declare an intent to accelerate the Loan. Therefore, because Defendants did not affirmatively exercise its option to accelerate the Loan Agreement, the Loan was not accelerated, and thus the term for measuring usury is the contracted-for three year term, and not the shorter term from closing to the filing of bankruptcy.

### 3. Usurious Loans Under Texas Law

Because the Loan Agreement was not accelerated, neither by the express terms of the Loan Agreement, by operation of bankruptcy law, nor by affirmative action of the Defendants, all interest charged by the Defendants must be spread over the contracted-for three year term. *See Frenchman's Creek,* 453 F.2d 1338; *Tanner,* 561 S.W.2d 777. Thus, the $132,640.19 in fees deemed to be interest by this Court,[36] must be spread over the three year term of the Loan Agreement, instead of the shorter period from closing to bankruptcy. Therefore, to determine whether the Loan Agreement is usurious after the spreading of the fees, this Court must compare the sum of the maximum interest allowable pre-bankruptcy and the maximum interest allowable post-bankruptcy to the actual interest charged, including any fees that are judicially deemed to be interest.

### A. The Maximum Amount of Interest Defendants Could Have Charged Pre–Bankruptcy

Because the Loan Agreement proposed a variable-rate, revolving credit loan, the task of determining the maximum allowable interest is a challenge as both the principal and interest fluctuated over the life of the Loan. Throughout the life of the Loan, AIR was borrowing against the line of credit while at the same time paying down the Loan on a daily basis. While the initial advance of principal to AIR was $559,161.07,[37] the aggregate of all advances

---

**36.** The $132,640.19 is composed of those fees deemed to be interest by this Court herein: Initial Facility Fee ($22,500), Attorney's Fees ($15,094.05), Collateral Monitoring Fee ($15,000), Audit Fee ($2,939.90), Lockbox Fee ($2,200), Check Copy Fee ($1,800), WTF Fee ($1,197.00), Search Fee ($4,987.50), Delivery Fee ($2,971.19), D & B Fee ($380.00), Phone Fee ($1,477.33), Postage Fee ($153.41), UCC Fee ($146.50), "CKCOP" Fee ($400.00), "Rtnfee" Fee ($60.00), "Rtnck" Fee ($5,912.05) and Minimum Usage Fee ($55,421.26).

**37.** The correct loan proceeds to use in the calculation is the "true principal," that is "[t]he amount of cash actually received by the borrower." *Tanner,* 561 S.W.2d at 782. Therefore, the $559,161.07 figure is lower than the actual amount listed on the Defendants' Interest Statements, which accounts for the subtraction of the $22,500 Initial Facility Fee.

of principal was $1,762,709.71 from closing to bankruptcy. *See* Exhibit 2 attached to this Opinion.[38] But even though over $1.7 million dollars was advanced to AIR, the high water mark of principal was $565,202.05 on July 8, 1998, and the low was $123,578.57 on May 25, 1999. *Id.* Therefore, the only way to determine the Maximum Interest that the Defendants could have charged pre-bankruptcy is to look at the Loan's Daily Balances, determined by taking the Advances of Principal minus any Payments by AIR, and multiply those figures by the Maximum Daily Rate[39] of 0.05 percent. Taking the Daily Balances and multiplying them by the Maximum Daily Rate of 0.05 percent would allow for $41,357.85 in Total Maximum Daily Interest to have been charged over the time from the Loan's closing to AIR's filing of bankruptcy. Therefore, $41,357.85 is the Maximum Interest that Defendants could have charged AIR pre-bankruptcy.

### B. The Maximum Amount of Interest Defendants Could Have Charged Post–Bankruptcy

██ Under Texas Law, to determine the amount of interest that a lender can charge, a court "takes the amount of the loan proceeds, multiplies it by the allowable rate of interest per year, and then multiplies that amount by the term for repayment[, with] ... [t]he total amount [being] the maximum amount of interest a party is entitled to charge over the term of the loan." *Pentico v. Mad–Wayler, Inc.,* 964 S.W.2d 708, 717 (Tex.App.—Corpus Christi 1998, pet. denied). In *Pentico,* the court took the loan proceeds ($100,000.00) and multiplied that figure by the rate of interest (10%), and then multiplied that amount by the term of repayment (3.5 years) to conclude that $35,000 was the maximum amount of interest allowed. *Id.* Therefore, under *Pentico,* when the $1.5 million Facility Limit[40] is multiplied by the monthly rate of interest (18% divided by 12 [1.5%]), and then that amount is multiplied by the remaining term of the Loan post-bankruptcy (25 months), this Court concludes that $562,500 was the maximum amount of interest that Defendants could have charged AIR post-bankruptcy.

When the maximum amounts of interest that could have been charged are added together, Defendants could have charged $603,857.85 in interest both pre-bankruptcy and post-bankruptcy. Therefore, when the $132,640.19 in fees determined to be

---

**38.** Exhibit 2 was created from Defendants' Interest Statements and Plaintiff's Loan Interest Analysis Exhibit tendered at the Cross Motions for Summary Judgment Hearing on October 30, 2001.

**39.** While the Maximum Annual Rate of Interest is eighteen percent, the Maximum Daily Rate of Interest would be eighteen percent divided by 360, or 0.05 percent. This Court used 360 for the number of Interest Calculation Days, because under the Loan Agreement, "[a]ll interest accruing ... shall be calculated on the basis of actual days elapsed, including the first but excluding the last day, plus three business days and a year of 360 days." Loan Agreement § 1.4.

**40.** The $1.5 million Facility Limit is used instead of the $129,103.66 in principal that remained outstanding at bankruptcy because to determine the maximum interest that could have been charged, a court must use the maximum amount of principal that could have been borrowed. This Court recognizes that the Borrowing Base is a formula, *see* supra note 2, and therefore, the maximum amount of principal available to AIR was limited by its Eligible Accounts and Eligible Inventory. However, if AIR had the requisite accounts and inventory, it was entitled to borrow up to $1.5 million. Therefore, even though AIR actually borrowed less than the $1.5 million, and only had $129,103.66 in outstanding principal, $1.5 million is the appropriate amount for calculating the maximum interest post-bankruptcy.

interest are spread over the full term of the Loan, in addition to the Actual Interest Charged to AIR in the amount of $35,857.08, *see* Exhibit 2, the Loan Agreement is not usurious, because the maximum interest that could have been charged ($603,857.85) is greater than that actually charged ($168,497.27).

### 4. Facially Usurious Loans Under Texas Law

 Since the Loan Agreement was not accelerated, thus eliminating any usury by spreading the charged interest over the contracted-for three year term, the only way that the Loan could be usurious is if the Loan Agreement is facially usurious. The Texas Supreme Court has stated that "unless the contract by its express and positive terms evidences an intention which requires a construction that unearned interest [is] to be collected in all events, the court will give it the construction that the parties intended that the unearned interest should not be collected." *Smart v. Tower Land and Investment Co.,* 597 S.W.2d 333, 341 (Tex.1980) (citing *Walker v. Temple Trust Co.,* 124 Tex. 575, 80 S.W.2d 935, 936–37 (1935)). In determining whether a contract is facially usurious, the court has stated:

> While of course courts have no right to depart from the terms in which the contract is expressed to make legal what the parties have made unlawful, nevertheless when the contract by its terms, construed as a whole, is doubtful, or even susceptible of more than one reasonable construction, the court will adopt the construction which comports with legality. It is presumed that in contracting parties intend to observe and obey the law. For this reason the court will not hold a contract to be in violation of the usury laws unless, upon a fair and reasonable interpretation of all its terms, it is manifest that the

intention was to exact more interest than allowed by law.

*Id.* at 340 (citing *Walker,* 80 S.W.2d at 936–37). Therefore, to determine if a loan is facially usurious, a court must compare the maximum allowable interest to the total interest contracted for under the terms of the loan, including any fees that are judicially deemed to be interest.

#### A. The Maximum Allowable Interest Under the Loan Agreement

As stated previously, to determine the amount of interest that a lender can charge under Texas law, a court "takes the amount of the loan proceeds, multiplies it by the allowable rate of interest per year, and then multiplies that amount by the term for repayment[, with] ... [t]he total amount [being] the maximum amount of interest a party is entitled to charge over the term of the loan." *Pentico,* 964 S.W.2d at 717. Plaintiff argues that the maximum amount of interest that could have been charged over the contracted-for three year term of the Loan was $301,946.25. Plaintiff derives this calculation by taking the loan proceeds ($559,161.07), and multiplying that figure by the rate of interest (18%), and then multiplying that amount by the term of repayment (3 years) to conclude that $301,946.25 was the maximum amount of interest allowed. However, Plaintiff's use of $559,161.07 as the "true principal" to determine the maximum amount of interest allowed was in error.

 When making a determination of whether a loan is facially usurious, a court does not look to what in fact happened under the loan, a court must look to what was contracted-for under the four corners of the loan. A facially usurious loan is one that is usurious from its inception, it charges more interest than allowed by law from the outset. Thus, this Court

can only look to the terms of the Loan Agreement to make the determination of whether the Loan was facially usurious. While the initial advance of principal was only $559,161.07, the Loan Agreement contemplated a Facility Limit of $1.5 million. Irrespective of the principal actually loaned to AIR, AIR could have borrowed $1.5 million, and thus to make a facially usurious determination, this Court will use the $1.5 million Facility Limit as the principal amount for determining the maximum interest allowed by the Loan Agreement's terms.[41] Therefore, under *Pentico,* when the $1.5 million Facility Limit is multiplied by the rate of interest (18%), and then that amount is multiplied by the term of repayment (3 years), this Court concludes that $810,000 was the maximum amount of interest allowed under the express terms of the Loan Agreement.

### B. The Total Interest Contracted–For Under the Terms of the Loan Agreement

■ Plaintiff argues that the Loan Agreement facially calls for interest of $366,500,[42] and when compared with its determination that only $301,946.25 could have been charged under the Loan, the Loan Agreement is facially usurious. This determination is again in error by Plaintiff. As this Court stated previously, the maximum interest that could have been charged under the Loan Agreement was $810,000. Therefore, for the Loan to be

facially usurious, the Loan Agreement must have facially allowed for more than $810,000 in interest.

Had the Loan actually reached the end of its contemplated three year term, AIR would have been charged $54,000 in Collateral Monitoring Fees for the thirty-six months of the Loan. This Court also knows that the Initial Facility Fee would still have been $22,500. However, that is where the known interest charged under the Loan Agreement ends. All other amounts for fees charged under the Loan Agreement are unknown on the face of the Loan Agreement. In making a facial determination of interest, this Court can not assume that the Attorney's Fees and other additional Expense Reimbursements would still have been $37,124.88.

As to the Minimum Usage Fee, the Loan Agreement provides:

> In the event that the income earned by [Defendants] during any calendar month ... is less that $10,600 (or, during the months of October through March $9,100) (the "income Requirement"), [AIR] shall pay to [Defendants] a minimum usage fee equal to the difference between the amount so earned by [Defendants] and the Income Requirement, regardless of [Defendants'] prior compensation.

Loan Agreement § 2.8. Plaintiff argues that because the highest true principal balance was only $565,202.05, when that fig-

---

**41.** As stated previously, if AIR had the requisite accounts and inventory, it was entitled to borrow up to $1.5 million. Thus despite the fact that AIR actually borrowed less than the $1.5 million, this Court must look to what the Loan Agreement allowed to be borrowed, and not to what in fact was borrowed. Therefore, $1.5 million is the appropriate amount for calculating whether the Loan Agreement was facially usurious.

**42.** This Court is unsure how Plaintiff calculated this figure. Plaintiff only states that the

amount of interest required by the Loan Agreement is $366,500 "when the stated interest plus the 'initial facility fee'-and 'minimum usage fee' are factored in as interest." Plaintiff later stated that "the accrual of stated interest plus the differential required by the minimum usage fee on the actual outstanding principal balance of the Loan from time to time, resulted in a usurious rate of interest from the inception of the Loan under the affirmative terms of the Loan Agreement." Despite these claims, no where does Plaintiff account for its calculation of $366,500.

ure is multiplied by the maximum interest rate or eighteen percent, the maximum monthly interest would be $8,478.03. Based on Plaintiff's calculation that the maximum monthly interest would be $8,478.03, Plaintiff claims that the Loan Agreement is facially usurious because when the Minimum Usage Fee is activated, the Loan Agreement calls for more interest than allowed by law. Again, what Plaintiff fails to account for, is that when making a calculation of whether a loan is facially usurious, a court does not look at what did happen, but what the loan expressly allowed for under its terms. In the case at bar, AIR could have borrowed enough principal that the Minimum Usage Fee would not have been activated. Had AIR borrowed the full $1.5 million, the monthly interest at eighteen percent would be $22,500, which is more than enough to ensure that the Minimum Usage Fee would not be charged.

Based on the foregoing analysis, this Court can only ascertain that $76,500 in fees deemed to be disguised interest, the Collateral Monitoring and Initial Facility Fees, were to be facially charged under the Loan Agreement. In addition, had AIR borrowed the full $1.5 million and had that amount of principal outstanding at the end of each year during the life of the Loan, AIR would have been obligated to pay the Annual Facility Fee in the amount of $15,000. Thus the total of the Annual Facility Fees could be anywhere between $0.00 and $30,000 over the contracted-for three year term. Furthermore, pursuant to rulings made herein, the Attorney's Fees, Audit Fee, and Additional Expense Reimbursements are all deemed to be disguised interest. However, on the face of the Loan Agreement, no dollar amount is associated with these fees to use in making a facial determination of usury. Finally, because the interest rate called for under the Loan Agreement was prime plus 2½ percent, no determination can be made as to the total amount of interest that was chargeable under Loan Agreement based on the $1.5 million Facility Limit. Because the Loan Agreement does not expressly call for more than $810,000 in interest, whether actual interest or judicially deemed interest, the Loan Agreement is not facially usurious.[43]

While the Loan Agreement could become usurious if certain contingencies occurred, this Court, applying *Smart* and *Walker*, must make a "fair and reasonable interpretation of all [the Loan Agreement's] terms, [and determine whether] it is manifest that the [Loan Agreement's] intention was to exact more interest than allowed by law." 597 S.W.2d at 340.[44] However, if a loan could become usurious due to certain contingencies, a savings clause will keep the loan from becoming

---

**43.** Even at 11 percent, which was the highest interest rate charged under the Loan Agreement prior to bankruptcy, the maximum interest would only be $495,000. After subtracting the maximum annual Facility Fees ($30,000), and the Collateral Monitoring and Initial Facility Fees ($76,500), there would still be a cushion of $208,500 for all other fees judicially deemed to be interest.

**44.** *See also Coxson v. Commonwealth Mortgage Co. of America*, 43 F.3d 189, 192 (5th Cir.1995) ("... we are guided by the general rule that the court should give the contract a construction that the parties intended that the

unearned interest would not be retained ..."); *Bernie's Custom Coach of Texas, Inc. v. Small Business Administration*, 987 F.2d 1195, 1199 (5th Cir.1993) ("... if the note is susceptible to more than one reasonable interpretation, we must adopt the construction that comports with legality."); *Frenchman's Creek*, 453 F.2d at 1344 ("The question of whether usury exists is ascertained from the dominant purpose and intent of the parties embodied in the contact interpreted as a whole and in light of attending circumstances and of the governing rules of law that the parties are presumed to have intended to obey.").

usurious. The Texas Supreme Court has stated that "[i]n the absence of a savings clause, ... [a loan's] expressed authorization to retain excess unearned interest overcomes the presumption of legality accorded to allegedly usurious contracts." *Smart,* 597 S.W.2d at 341. In the case at bar, if the Loan Agreement became usurious, Defendants were obligated under the Savings Clause to refund the usurious interest to AIR. The Savings Clause stated in pertinent part that:

> The parties hereto intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof, the parties hereto stipulate and agree than none of the terms and provisions contained in this Agreement or any other Transaction Document shall ever be construed to create a contract to pay, for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be charged by applicable law from time to time in effect.

Loan Agreement § 2.14. Therefore, the Loan Agreement is not facially usurious because "the [loan] by its terms, construed as a whole, is doubtful, ... [and] even susceptible [to] more than one reasonable construction, [and thus this Court] ... will adopt the construction which comports with legality." *See Smart,* 597 S.W.2d at 341. As such, this Court finds the Loan Agreement not to be facially usurious.[45]

## PLAINTIFF'S CLAIM FOR BREACH OF THE LOAN AGREEMENT

Plaintiff also alleges breach of the Loan Agreement based upon the Defendants alleged failure to "promptly" refund any usurious interest collected after receiving notice that it had charged a usurious interest rate. Under Texas law, to prevail on a breach of contract claim, a plaintiff must prove: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Valero Marketing & Supply Co. v. Kalama Intern.,* 51 S.W.3d 345, 351 (Tex.App.—Houston [1st Dist.] 2001) (citing *Hussong v. Schwan's Sales Enter., Inc.,* 896 S.W.2d 320, 326 (Tex.App.—Houston [1st Dist.] 1995)).

While there is no dispute as to the validity of the contract, the Loan Agreement's Savings Clause required that:

> If any indebtedness or obligation owed by the Company under the Transaction Documents is *prepaid or accelerated* and as a result any amounts held to constitute interest are determined to be in excess of the legal maximum, or [Defendants] shall otherwise collect moneys which are determined to constitute interest which would otherwise increase the interest on all or any part of such obligations to an amounts in excess of that permitted to be charged by applica-

---

**45.** Because this Court finds that the Loan Agreement was not facially usurious, nor was usurious interest charged because acceleration did not occur, it is therefore not necessary to reach a decision as to the other issues raised by the parties as to Plaintiff's claim for usury: 5) whether GBCC assumed Fidelity's liability for usury or had any knowledge of potential usury; 6) whether Defendants' Cure Letters were judicial admissions and whether they were proper in light of Texas law; and 7) whether the Loan Agreement' Savings Clause was an effective defense to usury. In addi-

tion, because this Court finds that usurious interest was not charged, Defendants' Cure Letters are merely refunds to AIR. Section 305.103(a) of the Texas Finance Code provides in pertinent part that a creditor "is not liable [for usury if] ... the creditor corrects the violation" by sending a Cure Letter. Based on this Court's ruling that no "violation" occurred, Defendants could not have cured any usurious interest because none existed to cure. Therefore, the money returned to AIR in the Cure Letters is nothing more than a refund of interest.

ble law then in effect, than all such sums determined to constitute interest in excess of such legal limit shall, without penalty, be *promptly* applied to reduce the then outstanding principal of the related indebtedness or obligations or, at [Defendants'] option returned to the Company or the other payor thereof upon such determination....

Loan Agreement § 2.14 (emphasis added). The Savings Clause only required that unearned interest be "promptly" refunded if there was a prepayment, *see Pentico,* 964 S.W.2d at 715, or if there was an acceleration, *see Armstrong,* 57 S.W.3d at 48, with either scenario resulting in interest being collected in excess of the legal maximum. As this Court has stated within this Opinion, there was neither a prepayment by AIR nor an acceleration by Defendants, and thus no usurious interest was charged which had to refunded. Therefore, pursuant to *Valero,* Defendants are not liable for breach for not "promptly" refunding interest, because they were under no duty to do so per the express terms of the Savings Clause.

PLAINTIFF'S OBJECTION TO DEFENDANTS' CLAIM

Finally, Plaintiff objects to Defendants' Claim based upon Defendants charging of usurious interest under the Loan Agreement. Plaintiff asks that this Court equitably subordinate Defendants' allowed Claim in the bankruptcy to all other allowed claims based upon Defendants charging of usurious interest under the Loan Agreement, and transfer any lien securing such subordinated claim to the estate. In addition, Plaintiff argues that after assessing the penalties for usury that it believes should be charged, penalties totaling $2,346,725.60, Defendants' Claim of $224,730.51 will be eliminated, thus netting Plaintiff $2,131,995.09. Therefore, this Court must determine whether Defendants' Claim should be equitably subordinated or disallowed under the Bankruptcy Code.

1. **Equitable Subordination of Claims Under the Bankruptcy Code**

Under the Bankruptcy Code, a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all of part of an allowed interest to all or part of another allowed interest" or "order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c).

The United States Court of Appeals for the Fifth Circuit has held that "equitable subordination is justified only if: (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim would not be inconsistent with the provisions of the [Bankruptcy Code]." *Matter of Herby's Foods, Inc.,* 2 F.3d 128, 130 (5th Cir.1993) (citing *In re Mobile Steel Co.,* 563 F.2d 692, 699–700 (5th Cir.1977)). In addition to the *Mobile Steel* three-prong test, three additional principles must also be considered in determining whether the three prongs of the subordination test have been satisfied:

First, the inequitable conduct by the claimant may be sufficient to warrant subordination whether or not the misconduct related to the acquisition or assertion of the claim. Second, a claim should be subordinated only to the extent necessary to offset the harm that the bankrupt and its creditors suffered as a result of the inequitable conduct. Third, the claims arising from the dealings between the debtor and its fiduciaries must be subjected to rigorous scru-

tiny, and, if sufficiently challenged, the burden shifts to the fiduciary to prove both the good faith of the transaction and its inherent fairness.

*Herby's Foods,* 2 F.3d at 130 (citing *Mobile Steel,* 563 F.2d at 700–701).

In the case at bar, Plaintiff's sole justification for equitable subordination of Defendants allowed Claim is that Defendants charged AIR usurious interest under the Loan Agreement. However, as this Court has stated within this Opinion, Defendants did not charge AIR usurious interest, either through acceleration of the Loan Agreement, or due to the Loan Agreement being facially usurious. Therefore, because Plaintiff has failed to show that Defendants "engaged in inequitable conduct" under the first prong of *Mobile Steel,* Plaintiff's claim for equitable subordination under 11 U.S.C. § 510(c) is not tenable.

### 2. Disallowance of Claims Under the Bankruptcy Code

#### A. *Unmatured Interest Under 11 U.S.C § 502(b)(2)*

Based upon this Court's finding that Defendants did not charge AIR usurious interest, Defendants' Claim can not be eliminated by the assessment of usury penalties, as no penalties are to be assessed to Defendants. Despite this Court's finding that Defendants did not charge AIR usurious interest, under 11 U.S.C. § 502, this Court is required to determine the amount of a Defendants' Claim as of the date of AIR's bankruptcy petition. Section 502 provides in pertinent part:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.

(b) ... if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such

claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that— (2) such claim is for unmatured interest.

11 U.S.C. § 502.

The Fifth Circuit Court of Appeals, in applying 502(b)(2), has stated that "interest stops accruing at the date of the filing of the petition," *Matter of West Texas Marketing Corp.,* 54 F.3d 1194, 1197 (5th Cir.1995) (citing H.R.REP. NO. 595, 95th Cong., 1st Sess. 353 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309; S.R.REP. No. 989, 95th Cong., 2d Sess. 63 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849), and that "post-petition accumulation of interest on claims against a bankrupt's estate are suspended." *In re Brints Cotton Marketing, Inc.,* 737 F.2d 1338, 1341 (5th Cir.1984). The Fifth Circuit's analysis, supported by Congressional intent, is that "allowing the accrual of postpetition interest in favor of one creditor would be 'inequitable' to other creditors." *In re Cajun Electric Power Co-op., Inc.,* 185 F.3d 446, 457 (5th Cir.1999) (citing *In re Timbers of Inwood Forest Assocs.,* 793 F.2d 1380, 1385 (5th Cir.1986), *aff'd on reh'g,* 808 F.2d 363 (1987) (en banc), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). Ultimately, 502(b)(2) "protects the debtor and its other creditors from the assertion of claims for amounts in excess of the benefit actually conveyed to the debtor." *In re ICH Corp.,* 230 B.R. 88, 94 (N.D.Tex.1999) (quoting Nicholas P. Saggese, et al., *A Practitioner's Guide to Exchange Offers and Consent Solicitations,* 24 Loy.L.A.L.Rev. 527, 550 (1991)).

While the overwhelming majority of cases interpreting 502(b)(2) have dealt with a creditor filing a claim for "unmatured" post-petition interest, the plain language of 502(b)(2) only states that 'unmatured' interest is disallowed. In ana-

lyzing a statute, a court should work directly from plain meaning, as "statutory interpretation properly begins with the language of the statute itself, including all of its parts." *Velis v. Kardanis,* 949 F.2d 78, 81 (3d Cir.1991). Therefore, "where ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *Id.* at 242, 109 S.Ct. 1026, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290.

This Court interprets 502(b)(2) to apply to all unmatured interest, just as the plain language of the statute reads. Section 502(b)(2) will thus be enforced according to its terms, which requires disallowance of unmatured interest, including both post-petition interest, and pre-petition interest that has not yet been earned at the date of the petition. This interpretation is implied by the language of 502(b)(2), which forbids the allowance of a claim for unmatured interest, thus the negative implication is that claims for pre-petition interest are allowable if they are matured. *See In re John Clay and Co., Inc.,* 43 B.R. 797, 812–13 (Bankr.D.Utah 1984). If pre-petition interest is not matured, it must be disallowed. This result will not be at odds with the intent of the drafters, which was to prohibit creditors from claiming unearned interest in an effort to get a greater return on their claim than other similarly situated creditors. Therefore, Section 502(b)(2) applies to unmatured pre-petition interest just as it does to unmatured post-petition interest.

In *In re ICH Corp.,* Judge Fitzwater, of the United States District Court for the Northern District of Texas, stated that "creditors are not permitted to recover any part of a debt that represents unaccrued interest as of the filing of the bankruptcy petition, even if the parties have tried to disguise the interest as principal." 230 B.R. at 94 (citing *In re Pengo Industries, Inc.,* 962 F.2d 543, 546 (5th Cir. 1992)). The court went on to state that if creditors were to allowed to disguise interest, this "would impermissibly permit creditors to make interest appear to be principal and then collect the unearned interest in contravention of the policy underlying § 502(b)." *ICH Corp.,* 230 B.R. at 94. "[T]he Code requires that the court determine the maturity of interest without reference to any *ipso facto* or any bankruptcy clause in the agreement creating a claim against the bankrupt entity." *Id.*

The conclusions of *ICH Corp.,* though dealing with disguised principal, are appropriate here as well. In the case at bar, Defendants frontloaded a number of fees associated with the Loan, fees which this Court has ruled within this Opinion to be disguised interest. It was the intent of the parties, and the law of Texas, *see Tanner,* 561 S.W.2d at 786–87, that these fees be spread over the contracted-for three year term, which if they had been so spread would have kept the interest rate below the maximum eighteen percent. Thus, at the time of AIR filing bankruptcy, Defendants had charged AIR fees which it not yet earned. This frontloaded disguised interest, if allowed to be retained by Defendants, would allow Defendants to "collect ... unearned interest in contravention of the policy underlying § 502(b)." *ICH Corp.,* 230 B.R. at 94. Therefore, this Court will determine the total amount of matured interest as of the date of bankruptcy, thus disallowing those fees judicial-

ly determined to be disguised interest as unmatured interest.[46]

### B. Pursuant to 11 U.S.C. § 502(b)(2), Defendants' Claim Included $54,243.06 in Unmatured Interest

Pursuant to rulings made herein, this Court determines that Defendants' claim included $54,243.06 in unmatured interest. This calculation was made by taking the Actual Interest Charged[47] of $35,857.08 and adding it to the $132,640.19 in Fees judicially deemed to be interest, and then subtracting from that total the Interest Refunded of $72,896.36, to come up with a total of $95,600.91 in Judicially Determined Interest. As previously determined, the Maximum Interest that could have been charged under the Loan Agreement pre-bankruptcy was $41,357.85, and when that figure is subtracted from the $95,600.91 in Judicially Determined Interest, the Total Unmatured Interest that Defendants included in their Claim is $54,243.06. Therefore, Defendants' Claim included $54,243.06 in unmatured interest that is disallowed under 11 U.S.C. § 502(b)(2).

| Loan Interest Analysis | |
|---|---|
| Actual Interest Charged | $ 35,857.08 |
| Initial Facility Fee | $ 22,500.00 |
| Attorney's Fees | $ 15,094.05 |
| Collateral Monitoring Fee | $ 15,000.00 |
| Audit Fee | $ 2,939.90 |
| Lockbox Fee | $ 2,200.00 |
| Check Copy Fee | $ 1,800.00 |
| WTF Fee | $ 1,197.00 |
| Search Fee | $ 4,987.50 |
| Delivery Fee | $ 2,971.19 |

| | |
|---|---|
| D & B Fee | $ 380.00 |
| Phone Fee | $ 1,477.33 |
| Postage Fee | $ 153.41 |
| UCC Fee | $ 146.50 |
| "CKCOP" Fee | $ 400.00 |
| "Rtnfee" Fee | $ 60.00 |
| "Rtnck" Fee | $ 5,912.05 |
| Minimum Usage Fee | $ 55,421.26 |
| Total Interest and Fees | $168,497.27 |
| Interest Refunded | $ 72,896.36 |
| Judicially Determined Interest | $ 95,600.91 |
| Maximum Interest Pre–Bankruptcy | $ 41,357.85 |
| Total Unmatured Interest | $ 54,243.06 |

### CONCLUSION

Pursuant to Texas usury law, only those fees charged for "separate and additional consideration," and that are also "reasonable," are "bona fide" and thus not disguised interest. Accordingly, only the Loan Agreement's Due Diligence Deposit was a "bona fide" fee and not disguised interest. However, the $132,640.19 in other fees charged by the Defendants under the Loan Agreement are deemed to be disguised interest, because no "separate and additional consideration" was given for those fees. Texas law requires the spreading of fees over the contracted-for term of the loan, unless the loan is paid off early by the borrower or accelerated by the lender. In the case at bar, the Loan was not paid off early by AIR, and it was not accelerated by Defendants, neither by the express terms of the Loan Agreement or by affirmative action of the Defendants. In addition, the filing of a bankruptcy petition does not accelerate a loan, and thus AIR's filing of bankruptcy did not acceler-

---

**46.** This ruling in no way impairs Defendants' right to post-petition interest under 11 U.S.C. § 506(b). Section 506(b) of the Code, an exception to 502(b)(2), "allows claims by oversecured creditors to include accrued interest at the contract rate, as well as attorneys' fees and other costs provided by the agreement with the debtor." *Timbers of Inwood,* 808 F.2d at 380 (Jones, dissenting), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740. Section 506(b) reads:

To the extent than an allowed claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such

claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or changes provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). Therefore, for Defendants' to be entitled to post-petition interest on their claim, the value of AIR's property securing Defendants' Claim must be greater than said Claim.

**47.** This calculation was made by Defendants using $581,686.07 as the amount of principal, which in error, includes the $22,500 Initial Facility Fee.

ate the Loan Agreement. Thus the period for determining whether the Loan Agreement was usurious is the contracted-for three year term, with those fees deemed to be interest spread over the contracted-for term of the Loan. When the fees deemed to be interest and the actual charged interest are spread over the three year term of the Loan Agreement, the Loan Agreement is not usurious. In addition, the Loan Agreement is not facially usurious, because the four corners of the Loan Agreement do not allow for the collection of more interest than allowed by law. Because usurious interest was not charged, Defendants did not breach the Loan Agreement by not "promptly" crediting back usurious interest. Therefore, Plaintiff's count for usury is without merit, and as such, Plaintiff's counts for breach of the Loan Agreement and equitable subordination of Defendants' Claim are also without merit.

Pursuant to 11 U.S.C. § 502, a bankruptcy court shall determine the amount of a creditor's claim as of the date of the filing of the bankruptcy petition. Despite Defendants not having charged AIR usurious interest, as of the date of bankruptcy Defendants had collected more interest than they were entitled to, interest which they would have earned had AIR not filed for bankruptcy. The maximum amount of interest that Defendants could have charged under the Loan Agreement, from closing to the date of bankruptcy, was $41,357.85. However, Defendants had charged $168,497.27 in interest as of the date of bankruptcy. After Defendants refunded $72,896.36 in interest to AIR, Defendants had still charged AIR $95,600.91 in interest. Therefore, after subtracting the maximum amount of interest that Defendants could have charged pre-bankruptcy, $41,357.85, from $95,600.91, Defendants charged AIR $54,243.06 in unmatured interest as of the date of bankruptcy. Therefore, under Section 502(b)(2) of the Code, Defendants' Claim in AIR's bankruptcy included unmatured interest, and thus, Defendants' claim shall be reduced by $54,243.06.

A separate order will be entered consistent with this memorandum opinion.

## EXHIBIT 1
### FIDELITY FUNDING FINANCIAL GROUP
### RESERVE ACCOUNT REPORT (FORMAT 2)
### FROM 01/01/95 TO 09/29/99

Company ID DD

DEPOSIT ACCOUNT–PROSPECTS
C/O FFFG
12770 MERIT DR
SUITE 600
DALLAS, TX 75251

| Transaction | Invoice/ Check Number | Debtor ID | Purchase Date | Eff. Date | Dsct Pct | Invoice Amt | Amt Paid | Advanced | Fee | Reserve Change | Reserve Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Relationship ID: 347 | | | AUTOMOTIVE INTERNAT. | | | | | BALANCE FORWARD: | | | 0.00 |
| | | | * * *CLOSED* * * * * | | | | | | | | |
| Rsrve Adjsmt | 053836 | | 08/14 | | | | | | | 15,000.00 | 15,000.00 |
| new business deposit dated 8.07.97 | | | | | | | | | | | |
| Rsrve Charge | | | 09/05 | | | | | | | − 4,036.00 | 10,964.00 |
| AUDIT W/E 9/4/97 | | | | | | | | | | | |
| Rsrve Charge | | | 09/12 | | | | | | | − 4,036.00 | 6,928.00 |
| AUDIT W/E 9/11/97 | | | | | | | | | | | |
| Rsrve Adjsmt | | | 11/20 | | | | | | | 4,036.00 | 10,964.00 |
| REVERSE DUPLICATE AUDIT W/E 9/11/97 | | | | | | | | | | | |
| Rsrve Charge | | | 11/21 | | | | | | | − 474.50 | 10,489.50 |
| SEARCH W/E 11/20/97 | | | | | | | | | | | |

| | Date | | Amount | Balance |
|---|---|---|---|---|
| Rsrve Charge DELIV W/E 11/25/97 | 11/26 | | − 143.50 | 10,346.00 |
| Rsrve Charge SEARCH W/E 11/25/97 | 11/26 | | − 423.50 | 9,922.50 |
| Rsrve Charge CRBUR W/E 12/4/97 | 12/11 | | − 265.00 | 9,657.50 |
| Rsrve Charge D & B MOV 1997 | 12/16 | | − 70.00 | 9,587.50 |
| Rsrve Charge SEARCH W/E 12/24/97 | 12/26 | | − 50.94 | 9,536.56 |
| Rsrve Charge DELIVERY FEE/ 12/19–12/24/97 | 12/26 | | − 10.75 | 9,525.81 |
| Rsrve Charge AUDIT–W/E 12/30/97 | 12/31 | | − 3,709.95 | 5,815.86 |
| Rsrve Charge SEARCH W/E 12/30/97 | 12/31 | | − 220.00 | 5,595.86 |
| Rsrve Charge D & B—DEC97 | 02/03 | | − 350.00 | 5,245.86 |
| Rsrve Charge DELIVERY W/E 2/5/98 | 02/06 | | − 12.90 | 5,232.96 |
| Rsrve Charge DELIVERY W/E 2/12/98 | 02/13 | | − 10.00 | 5,222.96 |
| Rsrve Charge UCC SEARCH W/E 2/12/98 | 02/13 | | − 283.00 | 4,939.96 |
| Rsrve Charge AUTO INT'L UCC SEARCH 2–6–98/2–12–98 | 02/13 | | − 61.01 | 4,878.95 |
| Rsrve Charge PHONE W/E 2/19/98 | 02/20 | | − 5.15 | 4,873.80 |
| Rsrve Charge UCC SEARCH 2–20–98/ 2–24–98 | 02/27 | | − 87.00 | 4,786.80 |
| Rsrve Charge PHONE—W/E 3/12/98 | 03/13 | | − 5.15 | 4,781.65 |
| Rsrve Charge PHONE W/E 3/27/98 | 03/31 | | − 12.75 | 4,768.90 |
| Rsrve Charge AUDIT FEE/ W E 03/31/98 | 04/03 | | − 75.10 | 4,693.80 |
| Rsrve Charge DELIVERY W/E 4/16/98 | 04/20 | | − 16.00 | 4,677.80 |
| Rsrve Charge UCC SEARCH W/E 4/16/98 | 04/20 | | − 1,730.50 | 2,947.30 |
| Rsrve Charge PHONE W/E 4/29/98 | 04/30 | | − 27.95 | 2,919.35 |
| Rsrve Charge PHONE CHG W/E 05/21/98 | 05/28 | | − 29.09 | 2,890.26 |
| Rsrve Charge PHONE—W/E 6/12/98 | 06/16 | | − 56.76 | 2,833.50 |
| Rsrve Charge DELIVERY FEE / W/E 06/25/98 | 06/26 | | − 11.25 | 2,822.25 |
| Rsrve Charge UCC SEARCH / WE 06/25/98 | 06/26 | | − 180.00 | 2,642.25 |
| Rsrve Charge APPRAISAL W/E 6/26/98 | 06/30 | | − 200.00 | 2,662.25 |
| Disbursement RESERVE RELEASE (CLOSE DUE DILIGENCE POST TO AIR01) | 07/01 | | − 2,442.25 | 0.00 |

| RELATIONSHIP TOTALS: | 0.00 | 0.00 | 0.00 |
|---|---|---|---|
| | 0.00 | 0.00 | 0.00 |

## EXHIBIT 2

| Date | Advance of Principal * | Payments By AIR | Daily Balance | Maximum Daily Rate ** | Maximum Daily Interest |
|---|---|---|---|---|---|
| 6/30/98 | $ 559,161.07 | $ 0.00 | $559,161.07 | 0.05% | $ 279.58 |
| 7/1/98 | $ 0.00 | $ 2,442.25 | $556,718.82 | 0.05% | $ 278.36 |
| 7/2/98 | $ 24,793.46 | $ 51,496.17 | $530,016.11 | 0.05% | $ 265.01 |
| 7/3/98 | $ 0.00 | $ 0.00 | $530,016.11 | 0.05% | $ 265.01 |
| 7/4/98 | $ 0.00 | $ 0.00 | $530,016.11 | 0.05% | $ 265.01 |
| 7/5/98 | $ 0.00 | $ 0.00 | $530,016.11 | 0.05% | $ 265.01 |
| 7/6/98 | $ 0.00 | $ 1,769.08 | $528,247.03 | 0.05% | $ 264.12 |
| 7/7/98 | $ 0.00 | $ 20,310.56 | $507,936.47 | 0.05% | $ 253.97 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/8/98 | $ | 62,188.00 | $ | 4,922.42 | $565,202.05 | 0.05% | $ | 282.60 |
| 7/9/98 | $ | 0.00 | $ | 1,582.78 | $563,619.27 | 0.05% | $ | 281.81 |
| 7/10/98 | $ | 0.00 | $ | 4,428.66 | $559,190.61 | 0.05% | $ | 279.60 |
| 7/11/98 | $ | 0.00 | $ | 0.00 | $559,190.61 | 0.05% | $ | 279.60 |
| 7/12/98 | $ | 0.00 | $ | 0.00 | $559,190.61 | 0.05% | $ | 279.60 |
| 7/13/98 | $ | 0.00 | $ | 94,114.22 | $465,076.39 | 0.05% | $ | 232.54 |
| 7/14/98 | $ | 0.00 | $ | 39,897.35 | $425,179.04 | 0.05% | $ | 212.59 |
| 7/15/98 | $ | 101,253.00 | $ | 9,949.73 | $516,482.31 | 0.05% | $ | 258.24 |
| 7/16/98 | $ | 0.00 | $ | 14,929.17 | $501,553.14 | 0.05% | $ | 250.78 |
| 7/17/98 | $ | 0.00 | $ | 14,637.54 | $486,915.60 | 0.05% | $ | 243.46 |
| 7/18/98 | $ | 0.00 | $ | 0.00 | $486,915.60 | 0.05% | $ | 243.46 |
| 7/19/98 | $ | 0.00 | $ | 0.00 | $486,915.60 | 0.05% | $ | 243.46 |
| 7/20/98 | $ | 0.00 | $ | 65,470.52 | $421,445.08 | 0.05% | $ | 210.72 |
| 7/21/98 | $ | 0.00 | $ | 16,087.09 | $405,357.99 | 0.05% | $ | 202.68 |
| 7/22/98 | $ | 75,000.00 | $ | 9,448.07 | $470,909.92 | 0.05% | $ | 235.45 |
| 7/23/98 | $ | 0.00 | $ | 17,017.84 | $453,892.08 | 0.05% | $ | 226.95 |
| 7/24/98 | $ | 0.00 | $ | 12,392.67 | $441,499.41 | 0.05% | $ | 220.75 |
| 7/25/98 | $ | 0.00 | $ | 0.00 | $441,499.41 | 0.05% | $ | 220.75 |
| 7/26/98 | $ | 0.00 | $ | 0.00 | $441,499.41 | 0.05% | $ | 220.75 |
| 7/27/98 | $ | 0.00 | $ | 53,794.45 | $387,704.96 | 0.05% | $ | 193.85 |
| 7/28/98 | $ | 0.00 | $ | 15,415.98 | $372,288.98 | 0.05% | $ | 186.14 |
| 7/29/98 | $ | 124,000.00 | $ | 7,701.27 | $488,587.71 | 0.05% | $ | 244.29 |
| 7/30/98 | $ | 0.00 | $ | 8,626.97 | $479,960.74 | 0.05% | $ | 239.98 |
| 7/31/98 | $ | 0.00 | $ | 16,947.94 | $463,012.80 | 0.05% | $ | 231.51 |
| 8/1/98 | $ | 0.00 | $ | 0.00 | $463,012.80 | 0.05% | $ | 231.51 |
| 8/2/98 | $ | 0.00 | $ | 0.00 | $463,012.80 | 0.05% | $ | 231.51 |
| 8/3/98 | $ | 0.00 | $ | 34,702.72 | $428,310.08 | 0.05% | $ | 214.16 |
| 8/4/98 | $ | 0.00 | $ | 4,327.40 | $423,982.68 | 0.05% | $ | 211.99 |
| 8/5/98 | $ | 87,000.00 | $ | 1,134.12 | $509,848.56 | 0.05% | $ | 254.92 |
| 8/6/98 | $ | 0.00 | $ | 3,850.39 | $505,998.17 | 0.05% | $ | 253.00 |
| 8/7/98 | $ | 0.00 | $ | 26,208.99 | $479,789.18 | 0.05% | $ | 239.89 |
| 8/8/98 | $ | 0.00 | $ | 0.00 | $479,789.18 | 0.05% | $ | 239.89 |
| 8/9/98 | $ | 0.00 | $ | 0.00 | $479,789.18 | 0.05% | $ | 239.89 |
| 8/10/98 | $ | 0.00 | $ | 9,380.26 | $470,408.92 | 0.05% | $ | 235.20 |
| 8/11/98 | $ | 0.00 | $ | 44,441.65 | $425,967.27 | 0.05% | $ | 212.98 |
| 8/12/98 | $ | 65,000.00 | $ | 2,588.27 | $488,379.00 | 0.05% | $ | 244.19 |
| 8/13/98 | $ | 0.00 | $ | 17,743.26 | $470,635.74 | 0.05% | $ | 235.32 |
| 8/14/98 | $ | 0.00 | $ | 15,490.74 | $455,145.00 | 0.05% | $ | 227.57 |
| 8/15/98 | $ | 0.00 | $ | 0.00 | $455,145.00 | 0.05% | $ | 227.57 |
| 8/16/98 | $ | 0.00 | $ | 0.00 | $455,145.00 | 0.05% | $ | 227.57 |
| 8/17/98 | $ | 0.00 | $ | 46,123.21 | $409,021.79 | 0.05% | $ | 204.51 |
| 8/18/98 | $ | 0.00 | $ | 8,057.29 | $400,964.50 | 0.05% | $ | 200.48 |
| 8/19/98 | $ | 64,000.00 | $ | 36,026.60 | $428,937.90 | 0.05% | $ | 214.47 |
| 8/20/98 | $ | 0.00 | $ | 1,736.10 | $427,201.80 | 0.05% | $ | 213.60 |
| 8/21/98 | $ | 0.00 | $ | 4,620.10 | $422,581.70 | 0.05% | $ | 211.29 |
| 8/22/98 | $ | 0.00 | $ | 0.00 | $422,581.70 | 0.05% | $ | 211.29 |
| 8/23/98 | $ | 0.00 | $ | 0.00 | $422,581.70 | 0.05% | $ | 211.29 |
| 8/24/98 | $ | 0.00 | $ | 59,593.52 | $362,988.18 | 0.05% | $ | 181.49 |
| 8/25/98 | $ | 0.00 | $ | 13,080.16 | $349,908.02 | 0.05% | $ | 174.95 |
| 8/26/98 | $ | 53,000.00 | $ | 3,517.15 | $399,390.87 | 0.05% | $ | 199.70 |
| 8/27/98 | $ | 0.00 | $ | 2,689.74 | $396,701.13 | 0.05% | $ | 198.35 |
| 8/28/98 | $ | 0.00 | $ | 8,922.96 | $387,778.17 | 0.05% | $ | 193.89 |
| 8/29/98 | $ | 0.00 | $ | 0.00 | $387,778.17 | 0.05% | $ | 193.89 |
| 8/30/98 | $ | 0.00 | $ | 0.00 | $387,778.17 | 0.05% | $ | 193.89 |
| 8/31/98 | $ | 0.00 | $ | 65,461.42 | $322,316.75 | 0.05% | $ | 161.16 |
| 9/1/98 | $ | 0.00 | $ | 19,399.32 | $302,917.43 | 0.05% | $ | 151.46 |
| 9/2/98 | $ | 62,000.00 | $ | 4,626.46 | $360,290.97 | 0.05% | $ | 180.15 |
| 9/3/98 | $ | 0.00 | $ | 1,397.56 | $358,893.41 | 0.05% | $ | 179.45 |
| 9/4/98 | $ | 0.00 | $ | 20,969.75 | $337,923.66 | 0.05% | $ | 168.96 |

| Date | | | | Balance | Rate | | |
|---|---|---|---|---|---|---|---|
| 9/5/98 | $ | 0.00 | $ | 0.00 | $337,923.66 | 0.05% | $ | 168.96 |
| 9/6/98 | $ | 0.00 | $ | 0.00 | $337,923.66 | 0.05% | $ | 168.96 |
| 9/7/98 | $ | 0.00 | $ | 0.00 | $337,923.66 | 0.05% | $ | 168.96 |
| 9/8/98 | $ | 0.00 | $ | 9,419.09 | $328,504.57 | 0.05% | $ | 164.25 |
| 9/9/98 | $ | 0.00 | $ | 34,416.10 | $294,088.47 | 0.05% | $ | 147.04 |
| 9/10/98 | $ | 0.00 | $ | 1,266.13 | $292,822.34 | 0.05% | $ | 146.41 |
| 9/11/98 | $ | 10,000.00 | $ | 3,541.98 | $299,280.36 | 0.05% | $ | 149.64 |
| 9/12/98 | $ | 0.00 | $ | 0.00 | $299,280.36 | 0.05% | $ | 149.64 |
| 9/13/98 | $ | 0.00 | $ | 0.00 | $299,280.36 | 0.05% | $ | 149.64 |
| 9/14/98 | $ | 0.00 | $ | 31,415.90 | $267,864.46 | 0.05% | $ | 133.93 |
| 9/15/98 | $ | 0.00 | $ | 22,830.36 | $245,034.10 | 0.05% | $ | 122.52 |
| 9/16/98 | $ | 47,500.00 | $ | 8,002.22 | $284,531.88 | 0.05% | $ | 142.27 |
| 9/17/98 | $ | 0.00 | $ | 7,742.49 | $276,789.39 | 0.05% | $ | 138.39 |
| 9/18/98 | $ | 0.00 | $ | 21,713.58 | $255,075.81 | 0.05% | $ | 127.54 |
| 9/19/98 | $ | 0.00 | $ | 0.00 | $255,075.81 | 0.05% | $ | 127.54 |
| 9/20/98 | $ | 0.00 | $ | 0.00 | $255,075.81 | 0.05% | $ | 127.54 |
| 9/21/98 | $ | 0.00 | $ | 18,278.46 | $236,797.35 | 0.05% | $ | 118.40 |
| 9/22/98 | $ | 23,000.00 | $ | 18,007.45 | $241,789.90 | 0.05% | $ | 120.89 |
| 9/23/98 | $ | 0.00 | $ | 3,250.90 | $238,539.00 | 0.05% | $ | 119.27 |
| 9/24/98 | $ | 0.00 | $ | 2,297.63 | $236,241.37 | 0.05% | $ | 118.12 |
| 9/25/98 | $ | 0.00 | $ | 249.90 | $235,991.47 | 0.05% | $ | 118.00 |
| 9/26/98 | $ | 0.00 | $ | 0.00 | $235,991.47 | 0.05% | $ | 118.00 |
| 9/27/98 | $ | 0.00 | $ | 0.00 | $235,991.47 | 0.05% | $ | 118.00 |
| 9/28/98 | $ | 0.00 | $ | 8,416.38 | $227,575.09 | 0.05% | $ | 113.79 |
| 9/29/98 | $ | 35,000.00 | $ | 9,898.74 | $252,676.35 | 0.05% | $ | 126.34 |
| 9/30/98 | $ | 0.00 | $ | 428.65 | $252,247.70 | 0.05% | $ | 126.12 |
| 10/1/98 | $ | 0.00 | $ | 212.86 | $252,034.84 | 0.05% | $ | 126.02 |
| 10/2/98 | $ | 0.00 | $ | 557.95 | $251,476.89 | 0.05% | $ | 125.74 |
| 10/3/98 | $ | 0.00 | $ | 0.00 | $251,476.89 | 0.05% | $ | 125.74 |
| 10/4/98 | $ | 0.00 | $ | 0.00 | $251,476.89 | 0.05% | $ | 125.74 |
| 10/5/98 | $ | 0.00 | $ | 14,820.50 | $236,656.39 | 0.05% | $ | 118.33 |
| 10/6/98 | $ | 0.00 | $ | 1,932.97 | $234,723.42 | 0.05% | $ | 117.36 |
| 10/7/98 | $ | 18,000.00 | $ | 292.97 | $252,430.45 | 0.05% | $ | 126.22 |
| 10/8/98 | $ | 0.00 | $ | 801.41 | $251,629.04 | 0.05% | $ | 125.81 |
| 10/9/98 | $ | 0.00 | $ | 11,684.99 | $239,944.05 | 0.05% | $ | 119.97 |
| 10/10/98 | $ | 0.00 | $ | 0.00 | $239,944.05 | 0.05% | $ | 119.97 |
| 10/11/98 | $ | 0.00 | $ | 0.00 | $239,944.05 | 0.05% | $ | 119.97 |
| 10/12/98 | $ | 0.00 | $ | 0.00 | $239,944.05 | 0.05% | $ | 119.97 |
| 10/13/98 | $ | 0.00 | $ | 30,145.36 | $209,798.69 | 0.05% | $ | 104.90 |
| 10/14/98 | $ | 27,000.00 | $ | 399.67 | $236,399.02 | 0.05% | $ | 118.20 |
| 10/15/98 | $ | 0.00 | $ | 4,419.73 | $231,979.29 | 0.05% | $ | 115.99 |
| 10/16/98 | $ | 0.00 | $ | 4,250.26 | $227,729.03 | 0.05% | $ | 113.86 |
| 10/17/98 | $ | 0.00 | $ | 0.00 | $227,729.03 | 0.05% | $ | 113.86 |
| 10/18/98 | $ | 0.00 | $ | 0.00 | $227,729.03 | 0.05% | $ | 113.86 |
| 10/19/98 | $ | 0.00 | $ | 14,891.95 | $212,837.08 | 0.05% | $ | 106.42 |
| 10/20/98 | $ | 0.00 | $ | 9,590.20 | $203,246.88 | 0.05% | $ | 101.62 |
| 10/21/98 | $ | 33,000.00 | $ | 4,183.63 | $232,063.25 | 0.05% | $ | 116.03 |
| 10/22/98 | $ | 0.00 | $ | 220.61 | $231,842.64 | 0.05% | $ | 115.92 |
| 10/23/98 | $ | 0.00 | $ | 974.94 | $230,867.70 | 0.05% | $ | 115.43 |
| 10/24/98 | $ | 0.00 | $ | 0.00 | $230,867.70 | 0.05% | $ | 115.43 |
| 10/25/98 | $ | 0.00 | $ | 0.00 | $230,867.70 | 0.05% | $ | 115.43 |
| 10/26/98 | $ | 0.00 | $ | 11,159.03 | $219,708.67 | 0.05% | $ | 109.85 |
| 10/27/98 | $ | 13,000.00 | $ | 1,692.01 | $231,016.66 | 0.05% | $ | 115.51 |
| 10/28/98 | $ | 0.00 | $ | 355.89 | $230,660.77 | 0.05% | $ | 115.33 |
| 10/29/98 | $ | 0.00 | $ | 1,151.05 | $229,509.72 | 0.05% | $ | 114.75 |
| 10/30/98 | $ | 0.00 | $ | 1,246.64 | $228,263.08 | 0.05% | $ | 114.13 |
| 10/31/98 | $ | 0.00 | $ | 0.00 | $228,263.08 | 0.05% | $ | 114.13 |
| 11/1/98 | $ | 0.00 | $ | 0.00 | $228,263.08 | 0.05% | $ | 114.13 |
| 11/2/98 | $ | 0.00 | $ | 5,824.22 | $222,438.86 | 0.05% | $ | 111.22 |

| Date | | | | | |
|---|---|---|---|---|---|
| 11/3/98 | $ 23,000.00 | $ 4,143.16 | $241,295.70 | 0.05% | $ 120.65 |
| 11/4/98 | $ 0.00 | $ 7,557.31 | $233,738.39 | 0.05% | $ 116.87 |
| 11/5/98 | $ 0.00 | $ 482.61 | $233,255.78 | 0.05% | $ 116.63 |
| 11/6/98 | $ 0.00 | $ 909.21 | $232,346.57 | 0.05% | $ 116.17 |
| 11/7/98 | $ 0.00 | $ 1,427.54 | $230,919.03 | 0.05% | $ 115.46 |
| 11/8/98 | $ 0.00 | $ 0.00 | $230,919.03 | 0.05% | $ 115.46 |
| 11/9/98 | $ 0.00 | $ 0.00 | $230,919.03 | 0.05% | $ 115.46 |
| 11/10/98 | $ 0.00 | $ 19,870.31 | $211,048.72 | 0.05% | $ 105.52 |
| 11/11/98 | $ 0.00 | $ 0.00 | $211,048.72 | 0.05% | $ 105.52 |
| 11/12/98 | $ 0.00 | $ 2,971.32 | $208,077.40 | 0.05% | $ 104.04 |
| 11/13/98 | $ 25,000.00 | $ 2,742.15 | $230,335.25 | 0.05% | $ 115.17 |
| 11/14/98 | $ 0.00 | $ 0.00 | $230,335.25 | 0.05% | $ 115.17 |
| 11/15/98 | $ 0.00 | $ 0.00 | $230,335.25 | 0.05% | $ 115.17 |
| 11/16/98 | $ 0.00 | $ 7,007.50 | $223,327.75 | 0.05% | $ 111.66 |
| 11/17/98 | $ 0.00 | $ 1,043.24 | $222,284.51 | 0.05% | $ 111.14 |
| 11/18/98 | $ 0.00 | $ 48.23 | $222,236.28 | 0.05% | $ 111.12 |
| 11/19/98 | $ 0.00 | $ 645.58 | $221,590.70 | 0.05% | $ 110.80 |
| 11/20/98 | $ 0.00 | $ 75.99 | $221,514.71 | 0.05% | $ 110.76 |
| 11/21/98 | $ 0.00 | $ 0.00 | $221,514.71 | 0.05% | $ 110.76 |
| 11/22/98 | $ 0.00 | $ 0.00 | $221,514.71 | 0.05% | $ 110.76 |
| 11/23/98 | $ 0.00 | $ 2,718.52 | $218,796.19 | 0.05% | $ 109.40 |
| 11/24/98 | $ 0.00 | $ 6,474.89 | $212,321.30 | 0.05% | $ 106.16 |
| 11/25/98 | $ 2,500.00 | $ 996.85 | $213,824.45 | 0.05% | $ 106.91 |
| 11/26/98 | $ 0.00 | $ 0.00 | $213,824.45 | 0.05% | $ 106.91 |
| 11/27/98 | $ 0.00 | $ 0.00 | $213,824.45 | 0.05% | $ 106.91 |
| 11/28/98 | $ 0.00 | $ 0.00 | $213,824.45 | 0.05% | $ 106.91 |
| 11/29/98 | $ 0.00 | $ 0.00 | $213,824.45 | 0.05% | $ 106.91 |
| 11/30/98 | $ 0.00 | $ 3,482.42 | $210,342.03 | 0.05% | $ 105.17 |
| 12/1/98 | $ 9,000.00 | $ 2,547.27 | $216,794.76 | 0.05% | $ 108.40 |
| 12/2/98 | $ 0.00 | $ 2,500.06 | $214,294.70 | 0.05% | $ 107.15 |
| 12/3/98 | $ 0.00 | $ 1,117.25 | $213,177.45 | 0.05% | $ 106.59 |
| 12/4/98 | $ 0.00 | $ 514.67 | $212,662.78 | 0.05% | $ 106.33 |
| 12/5/98 | $ 0.00 | $ 0.00 | $212,662.78 | 0.05% | $ 106.33 |
| 12/6/98 | $ 0.00 | $ 0.00 | $212,662.78 | 0.05% | $ 106.33 |
| 12/7/98 | $ 4,000.00 | $ 17,748.74 | $198,914.04 | 0.05% | $ 99.46 |
| 12/8/98 | $ 12,772.50 | $ 5,650.00 | $206,036.54 | 0.05% | $ 103.02 |
| 12/9/98 | $ 0.00 | $ 7,530.25 | $198,506.29 | 0.05% | $ 99.25 |
| 12/10/98 | $ 0.00 | $ 1,152.20 | $197,354.09 | 0.05% | $ 98.68 |
| 12/11/98 | $ 0.00 | $ 1,907.59 | $195,446.50 | 0.05% | $ 97.72 |
| 12/12/98 | $ 0.00 | $ 0.00 | $195,446.50 | 0.05% | $ 97.72 |
| 12/13/98 | $ 0.00 | $ 0.00 | $195,446.50 | 0.05% | $ 97.72 |
| 12/14/98 | $ 0.00 | $ 4,028.88 | $191,417.62 | 0.05% | $ 95.71 |
| 12/15/98 | $ 16,910.00 | $ 3,229.43 | $205,098.19 | 0.05% | $ 102.55 |
| 12/16/98 | $ 0.00 | $ 272.71 | $204,825.48 | 0.05% | $ 102.41 |
| 12/17/98 | $ 0.00 | $ 800.06 | $204,025.42 | 0.05% | $ 102.01 |
| 12/18/98 | $ 0.00 | $ 656.16 | $203,369.26 | 0.05% | $ 101.68 |
| 12/19/98 | $ 0.00 | $ 0.00 | $203,369.26 | 0.05% | $ 101.68 |
| 12/20/98 | $ 0.00 | $ 0.00 | $203,369.26 | 0.05% | $ 101.68 |
| 12/21/98 | $ 0.00 | $ 3,632.37 | $199,736.89 | 0.05% | $ 99.87 |
| 12/22/98 | $ 15,000.00 | $ 6,568.17 | $208,168.72 | 0.05% | $ 104.08 |
| 12/23/98 | $ 0.00 | $ 123.33 | $208,045.39 | 0.05% | $ 104.02 |
| 12/24/98 | $ 0.00 | $ 88.37 | $207,957.02 | 0.05% | $ 103.98 |
| 12/25/98 | $ 0.00 | $ 0.00 | $207,957.02 | 0.05% | $ 103.98 |
| 12/26/98 | $ 0.00 | $ 0.00 | $207,957.02 | 0.05% | $ 103.98 |
| 12/27/98 | $ 0.00 | $ 0.00 | $207,957.02 | 0.05% | $ 103.98 |
| 12/28/98 | $ 0.00 | $ 4,305.72 | $203,651.30 | 0.05% | $ 101.83 |
| 12/29/98 | $ 0.00 | $ 13,721.32 | $189,929.98 | 0.05% | $ 94.96 |
| 12/30/98 | $ 0.00 | $ 0.00 | $189,929.98 | 0.05% | $ 94.96 |
| 12/31/98 | $ 0.00 | $ 241.09 | $189,688.89 | 0.05% | $ 94.84 |

| | | | | | |
|---|---|---|---|---|---|
| 1/1/99 | $ 0.00 | $ 0.00 | $189,688.89 | 0.05% | $ 94.84 |
| 1/2/99 | $ 0.00 | $ 0.00 | $189,688.89 | 0.05% | $ 94.84 |
| 1/3/99 | $ 0.00 | $ 0.00 | $189,688.89 | 0.05% | $ 94.84 |
| 1/4/99 | $ 0.00 | $ 939.22 | $188,749.67 | 0.05% | $ 94.37 |
| 1/5/99 | $ 9,000.00 | $ 5,043.52 | $192,706.15 | 0.05% | $ 96.35 |
| 1/6/99 | $ 0.00 | $ 55.29 | $192,650.86 | 0.05% | $ 96.33 |
| 1/7/99 | $ 0.00 | $ 60.84 | $192,590.02 | 0.05% | $ 96.30 |
| 1/8/99 | $ 0.00 | $ 7,562.34 | $185,027.68 | 0.05% | $ 92.51 |
| 1/9/99 | $ 0.00 | $ 0.00 | $185,027.68 | 0.05% | $ 92.51 |
| 1/10/99 | $ 0.00 | $ 0.00 | $185,027.68 | 0.05% | $ 92.51 |
| 1/11/99 | $ 0.00 | $ 4,339.64 | $180,688.04 | 0.05% | $ 90.34 |
| 1/12/99 | $ 0.00 | $ 5,189.18 | $175,498.86 | 0.05% | $ 87.75 |
| 1/13/99 | $ 10,000.00 | $ 379.44 | $185,119.42 | 0.05% | $ 92.56 |
| 1/14/99 | $ 0.00 | $ 626.76 | $184,492.66 | 0.05% | $ 92.25 |
| 1/15/99 | $ 0.00 | $ 692.63 | $183,800.03 | 0.05% | $ 91.90 |
| 1/16/99 | $ 0.00 | $ 0.00 | $183,800.03 | 0.05% | $ 91.90 |
| 1/17/99 | $ 0.00 | $ 0.00 | $183,800.03 | 0.05% | $ 91.90 |
| 1/18/99 | $ 0.00 | $ 0.00 | $183,800.03 | 0.05% | $ 91.90 |
| 1/19/99 | $ 0.00 | $ 1,176.21 | $182,623.82 | 0.05% | $ 91.31 |
| 1/20/99 | $ 0.00 | $ 4,774.59 | $177,849.23 | 0.05% | $ 88.92 |
| 1/21/99 | $ 0.00 | $ 492.95 | $177,356.28 | 0.05% | $ 88.68 |
| 1/22/99 | $ 0.00 | $ 79.54 | $177,276.74 | 0.05% | $ 88.64 |
| 1/23/99 | $ 0.00 | $ 0.00 | $177,276.74 | 0.05% | $ 88.64 |
| 1/24/99 | $ 0.00 | $ 0.00 | $177,276.74 | 0.05% | $ 88.64 |
| 1/25/99 | $ 0.00 | $ 5,747.83 | $171,528.91 | 0.05% | $ 85.76 |
| 1/26/99 | $ 0.00 | $ 552.64 | $170,976.27 | 0.05% | $ 85.49 |
| 1/27/99 | $ 0.00 | $ 141.44 | $170,834.83 | 0.05% | $ 85.42 |
| 1/28/99 | $ 0.00 | $ 131.77 | $170,703.06 | 0.05% | $ 85.35 |
| 1/29/99 | $ 0.00 | $ 700.10 | $170,002.96 | 0.05% | $ 85.00 |
| 1/30/99 | $ 0.00 | $ 0.00 | $170,002.96 | 0.05% | $ 85.00 |
| 1/31/99 | $ 0.00 | $ 0.00 | $170,002.96 | 0.05% | $ 85.00 |
| 2/1/99 | $ 0.00 | $ 6,083.25 | $163,919.71 | 0.05% | $ 81.96 |
| 2/2/99 | $ 15,000.00 | $ 0.00 | $178,919.71 | 0.05% | $ 89.46 |
| 2/3/99 | $ 0.00 | $ 197.71 | $178,722.00 | 0.05% | $ 89.36 |
| 2/4/99 | $ 0.00 | $ 0.00 | $178,722.00 | 0.05% | $ 89.36 |
| 2/5/99 | $ 4,000.00 | $ 73.79 | $182,648.21 | 0.05% | $ 91.32 |
| 2/6/99 | $ 0.00 | $ 0.00 | $182,648.21 | 0.05% | $ 91.32 |
| 2/7/99 | $ 0.00 | $ 0.00 | $182,648.21 | 0.05% | $ 91.32 |
| 2/8/99 | $ 0.00 | $ 6,617.81 | $176,030.40 | 0.05% | $ 88.02 |
| 2/9/99 | $ 0.00 | $ 343.86 | $175,686.54 | 0.05% | $ 87.84 |
| 2/10/99 | $ 0.00 | $ 817.78 | $174,868.76 | 0.05% | $ 87.43 |
| 2/11/99 | $ 1,000.00 | $ 2,375.07 | $173,493.69 | 0.05% | $ 86.75 |
| 2/12/99 | $ 0.00 | $ 661.59 | $172,832.10 | 0.05% | $ 86.42 |
| 2/13/99 | $ 0.00 | $ 0.00 | $172,832.10 | 0.05% | $ 86.42 |
| 2/14/99 | $ 0.00 | $ 0.00 | $172,832.10 | 0.05% | $ 86.42 |
| 2/15/99 | $ 0.00 | $ 0.00 | $172,832.10 | 0.05% | $ 86.42 |
| 2/16/99 | $ 0.00 | $ 12,711.35 | $160,120.75 | 0.05% | $ 80.06 |
| 2/17/99 | $ 6,000.00 | $ 324.00 | $165,796.75 | 0.05% | $ 82.90 |
| 2/18/99 | $ 0.00 | $ 171.38 | $165,625.37 | 0.05% | $ 82.81 |
| 2/19/99 | $ 0.00 | $ 538.36 | $165,087.01 | 0.05% | $ 82.54 |
| 2/20/99 | $ 0.00 | $ 0.00 | $165,087.01 | 0.05% | $ 82.54 |
| 2/21/99 | $ 0.00 | $ 0.00 | $165,087.01 | 0.05% | $ 82.54 |
| 2/22/99 | $ 20,009.44 | $ 5,586.14 | $179,510.31 | 0.05% | $ 89.76 |
| 2/23/99 | $ 0.00 | $ 0.00 | $179,510.31 | 0.05% | $ 89.76 |
| 2/24/99 | $ 0.00 | $ 102.98 | $179,407.33 | 0.05% | $ 89.70 |
| 2/25/99 | $ 7,579.46 | $ 349.53 | $186,637.26 | 0.05% | $ 93.32 |
| 2/26/99 | $ 0.00 | $ 1,619.50 | $185,017.76 | 0.05% | $ 92.51 |
| 2/27/99 | $ 0.00 | $ 0.00 | $185,017.76 | 0.05% | $ 92.51 |
| 2/28/99 | $ 0.00 | $ 0.00 | $185,017.76 | 0.05% | $ 92.51 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3/1/99 | $ | 4,052.50 | $ | 621.70 | $188,448.56 | 0.05% | $ | 94.22 |
| 3/2/99 | $ | 0.00 | $ | 1,383.11 | $187,065.45 | 0.05% | $ | 93.53 |
| 3/3/99 | $ | 0.00 | $ | 245.93 | $186,819.52 | 0.05% | $ | 93.41 |
| 3/4/99 | $ | 17,406.03 | $ | 0.00 | $204,225.55 | 0.05% | $ | 102.11 |
| 3/5/99 | $ | 0.00 | $ | 55.70 | $204,169.85 | 0.05% | $ | 102.08 |
| 3/6/99 | $ | 0.00 | $ | 0.00 | $204,169.85 | 0.05% | $ | 102.08 |
| 3/7/99 | $ | 0.00 | $ | 0.00 | $204,169.85 | 0.05% | $ | 102.08 |
| 3/8/99 | $ | 7,141.07 | $ | 1,338.94 | $209,971.98 | 0.05% | $ | 104.99 |
| 3/9/99 | $ | 0.00 | $ | 0.00 | $209,971.98 | 0.05% | $ | 104.99 |
| 3/10/99 | $ | 0.00 | $ | 34,369.41 | $175,602.57 | 0.05% | $ | 87.80 |
| 3/11/99 | $ | 0.00 | $ | 4,676.06 | $170,926.51 | 0.05% | $ | 85.46 |
| 3/12/99 | $ | 0.00 | $ | 1,241.19 | $169,685.32 | 0.05% | $ | 84.84 |
| 3/13/99 | $ | 0.00 | $ | 0.00 | $169,685.32 | 0.05% | $ | 84.84 |
| 3/14/99 | $ | 0.00 | $ | 0.00 | $169,685.32 | 0.05% | $ | 84.84 |
| 3/15/99 | $ | 0.00 | $ | 4,419.81 | $165,265.51 | 0.05% | $ | 82.63 |
| 3/16/99 | $ | 11,810.18 | $ | 243.86 | $176,831.83 | 0.05% | $ | 88.42 |
| 3/17/99 | $ | 0.00 | $ | 1,056.45 | $175,775.38 | 0.05% | $ | 87.89 |
| 3/18/99 | $ | 0.00 | $ | 0.00 | $175,775.38 | 0.05% | $ | 87.89 |
| 3/19/99 | $ | 8,500.00 | $ | 4,299.43 | $179,975.95 | 0.05% | $ | 89.99 |
| 3/20/99 | $ | 0.00 | $ | 0.00 | $179,975.95 | 0.05% | $ | 89.99 |
| 3/21/99 | $ | 0.00 | $ | 0.00 | $179,975.95 | 0.05% | $ | 89.99 |
| 3/22/99 | $ | 0.00 | $ | 1,087.58 | $178,888.37 | 0.05% | $ | 89.44 |
| 3/23/99 | $ | 2,333.00 | $ | 614.40 | $180,606.97 | 0.05% | $ | 90.30 |
| 3/24/99 | $ | 0.00 | $ | 594.98 | $180,011.99 | 0.05% | $ | 90.01 |
| 3/25/99 | $ | 0.00 | $ | 1,331.06 | $178,680.93 | 0.05% | $ | 89.34 |
| 3/26/99 | $ | 0.00 | $ | 476.53 | $178,204.40 | 0.05% | $ | 89.10 |
| 3/27/99 | $ | 0.00 | $ | 0.00 | $178,204.40 | 0.05% | $ | 89.10 |
| 3/28/99 | $ | 0.00 | $ | 0.00 | $178,204.40 | 0.05% | $ | 89.10 |
| 3/29/99 | $ | 0.00 | $ | 623.13 | $177,581.27 | 0.05% | $ | 88.79 |
| 3/30/99 | $ | 0.00 | $ | 613.20 | $176,968.07 | 0.05% | $ | 88.48 |
| 3/31/99 | $ | 0.00 | $ | 2,372.79 | $174,595.28 | 0.05% | $ | 87.30 |
| 4/1/99 | $ | 0.00 | $ | 265.74 | $174,329.54 | 0.05% | $ | 87.16 |
| 4/2/99 | $ | 0.00 | $ | 2,125.09 | $172,204.45 | 0.05% | $ | 86.10 |
| 4/3/99 | $ | 0.00 | $ | 0.00 | $172,204.45 | 0.05% | $ | 86.10 |
| 4/4/99 | $ | 0.00 | $ | 0.00 | $172,204.45 | 0.05% | $ | 86.10 |
| 4/5/99 | $ | 0.00 | $ | 1,230.18 | $170,974.27 | 0.05% | $ | 85.49 |
| 4/6/99 | $ | 0.00 | $ | 2,462.96 | $168,511.31 | 0.05% | $ | 84.26 |
| 4/7/99 | $ | 0.00 | $ | 0.00 | $168,511.31 | 0.05% | $ | 84.26 |
| 4/8/99 | $ | 0.00 | $ | 389.19 | $168,122.12 | 0.05% | $ | 84.06 |
| 4/9/99 | $ | 0.00 | $ | 720.84 | $167,401.28 | 0.05% | $ | 83.70 |
| 4/10/99 | $ | 0.00 | $ | 0.00 | $167,401.28 | 0.05% | $ | 83.70 |
| 4/11/99 | $ | 0.00 | $ | 0.00 | $167,401.28 | 0.05% | $ | 83.70 |
| 4/12/99 | $ | 0.00 | $ | 2,414.90 | $164,986.38 | 0.05% | $ | 82.49 |
| 4/13/99 | $ | 0.00 | $ | 1,711.72 | $163,274.66 | 0.05% | $ | 81.64 |
| 4/14/99 | $ | 5,500.00 | $ | 3,000.94 | $165,773.72 | 0.05% | $ | 82.89 |
| 4/15/99 | $ | 0.00 | $ | 441.67 | $165,332.05 | 0.05% | $ | 82.67 |
| 4/16/99 | $ | 0.00 | $ | 6,478.92 | $158,853.13 | 0.05% | $ | 79.43 |
| 4/17/99 | $ | 0.00 | $ | 0.00 | $158,853.13 | 0.05% | $ | 79.43 |
| 4/18/99 | $ | 0.00 | $ | 0.00 | $158,853.13 | 0.05% | $ | 79.43 |
| 4/19/99 | $ | 0.00 | $ | 3,333.90 | $155,519.23 | 0.05% | $ | 77.76 |
| 4/20/99 | $ | 0.00 | $ | 5,945.32 | $149,573.91 | 0.05% | $ | 74.79 |
| 4/21/99 | $ | 9,500.00 | $ | 54.00 | $159,019.91 | 0.05% | $ | 79.51 |
| 4/22/99 | $ | 0.00 | $ | 272.21 | $158,747.70 | 0.05% | $ | 79.37 |
| 4/23/99 | $ | 0.00 | $ | 374.53 | $158,373.17 | 0.05% | $ | 79.19 |
| 4/24/99 | $ | 0.00 | $ | 0.00 | $158,373.17 | 0.05% | $ | 79.19 |
| 4/25/99 | $ | 0.00 | $ | 0.00 | $158,373.17 | 0.05% | $ | 79.19 |
| 4/26/99 | $ | 0.00 | $ | 1,007.49 | $157,365.68 | 0.05% | $ | 78.68 |
| 4/27/99 | $ | 0.00 | $ | 4,023.02 | $153,342.66 | 0.05% | $ | 76.67 |
| 4/28/99 | $ | 5,000.00 | $ | 0.00 | $158,342.66 | 0.05% | $ | 79.17 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/29/99 | $ | 0.00 | $ | 2,831.70 | $155,510.96 | 0.05% | $ | 77.76 |
| 4/30/99 | $ | 0.00 | $ | 1,408.36 | $154,102.60 | 0.05% | $ | 77.05 |
| 5/1/99 | $ | 0.00 | $ | 0.00 | $154,102.60 | 0.05% | $ | 77.05 |
| 5/2/99 | $ | 0.00 | $ | 0.00 | $154,102.60 | 0.05% | $ | 77.05 |
| 5/3/99 | $ | 0.00 | $ | 5,556.72 | $148,545.88 | 0.05% | $ | 74.27 |
| 5/4/99 | $ | 0.00 | $ | 3,197.41 | $145,348.47 | 0.05% | $ | 72.67 |
| 5/5/99 | $ | 0.00 | $ | 458.96 | $144,889.51 | 0.05% | $ | 72.44 |
| 5/6/99 | $ | 8,400.00 | $ | 186.20 | $153,103.31 | 0.05% | $ | 76.55 |
| 5/7/99 | $ | 0.00 | $ | 141.24 | $152,962.07 | 0.05% | $ | 76.48 |
| 5/8/99 | $ | 0.00 | $ | 0.00 | $152,962.07 | 0.05% | $ | 76.48 |
| 5/9/99 | $ | 0.00 | $ | 0.00 | $152,962.07 | 0.05% | $ | 76.48 |
| 5/10/99 | $ | 0.00 | $ | 3,499.84 | $149,462.23 | 0.05% | $ | 74.73 |
| 5/11/99 | $ | 0.00 | $ | 3,969.19 | $145,493.04 | 0.05% | $ | 72.75 |
| 5/12/99 | $ | 0.00 | $ | 8,974.27 | $136,518.77 | 0.05% | $ | 68.26 |
| 5/13/99 | $ | 0.00 | $ | 261.38 | $136,257.39 | 0.05% | $ | 68.13 |
| 5/14/99 | $ | 10,400.00 | $ | 9,156.00 | $137,501.39 | 0.05% | $ | 68.75 |
| 5/15/99 | $ | 0.00 | $ | 0.00 | $137,501.39 | 0.05% | $ | 68.75 |
| 5/16/99 | $ | 0.00 | $ | 0.00 | $137,501.39 | 0.05% | $ | 68.75 |
| 5/17/99 | $ | 0.00 | $ | 2,195.75 | $135,305.64 | 0.05% | $ | 67.65 |
| 5/18/99 | $ | 0.00 | $ | 268.26 | $135,037.38 | 0.05% | $ | 67.52 |
| 5/19/99 | $ | 0.00 | $ | 3,342.20 | $131,695.18 | 0.05% | $ | 65.85 |
| 5/20/99 | $ | 0.00 | $ | 140.63 | $131,554.55 | 0.05% | $ | 65.78 |
| 5/21/99 | $ | 0.00 | $ | 1,215.97 | $130,338.58 | 0.05% | $ | 65.17 |
| 5/22/99 | $ | 0.00 | $ | 0.00 | $130,338.58 | 0.05% | $ | 65.17 |
| 5/23/99 | $ | 0.00 | $ | 0.00 | $130,338.58 | 0.05% | $ | 65.17 |
| 5/24/99 | $ | 0.00 | $ | 3,522.95 | $126,815.63 | 0.05% | $ | 63.41 |
| 5/25/99 | $ | 0.00 | $ | 3,237.06 | $123,578.57 | 0.05% | $ | 61.79 |
| 5/26/99 | $ | 8,000.00 | $ | 748.57 | $130,830.00 | 0.05% | $ | 65.42 |
| 5/27/99 | $ | 0.00 | $ | 329.44 | $130,500.56 | 0.05% | $ | 65.25 |
| 5/28/99 | $ | 0.00 | $ | 1,396.90 | $129,103.66 | 0.05% | $ | 64.55 |
| **Totals** | **$1,762,709.71** | | **$1,633,606.05** | | | | **$41,357.85** |

\* Excludes $22,500 facility fee ·

\*\* While the Maximum Annual Rate of Interest is eighteen (18) percent, the Maximum Daily Rate of Interest would be eighteen (18) percent divided by 360, or 0.05 percent. This Court used 360 for the number of Interest Calculation Days, which is the number of days the parties contracted for in the Loan Agreement. See Loan Agreement § 1.4.